Mrs. Ethel Mae **MATHEWS** et al.

v.

Mayor Sam **MASSELL,** in his official capacity, et al.

Civ. A. No. 17814.

United States District Court,
N. D. Georgia,
Atlanta Division.

March 15, 1973.

N. Jerold Cohen, Alfred C. Aman, David A. Webster, Stuart E. Eizenstat, Atlanta, Ga., for plaintiffs.

Henry L. Bowden, Henry R. Bauer, Jr., Thomas F. Choyce, Atlanta, Ga., for defendants.

ORDER

RICHARD C. FREEMAN, District Judge.

This is an action brought by plaintiffs, citizens and taxpayers of the City of Atlanta, on behalf of themselves and all others similarly situated, against de-

fendants, the mayor and members of the Board of Aldermen of the City of Atlanta. Plaintiffs challenge the way in which defendants have utilized a portion of the funds received by the City pursuant to the "State and Local Fiscal Assistance Act of 1972", popularly known as the Revenue Sharing Act.

On February 22, 1973, a hearing was held on plaintiffs' motion for preliminary injunction. A stipulation of the relevant facts was entered into by the parties prior to the hearing; briefs were also filed before hearing. After the hearing the court gave the parties additional time in which to brief the jurisdictional issues presented and to amplify on the merits of the controversy. Additional briefs were filed by both parties. On February 26, 1973, in view of the lack of disputed facts and the complete analysis of the problem being undertaken by the parties, the court entered an order stating that, pursuant to Rule 65(a)(2), Fed.R.Civ.P., the court would consolidate the trial on the merits with the hearing on the motion for a preliminary injunction, subject to objection by either party. Defendants have filed such an objection, based on an argument that regulations may be forthcoming from the Treasury Department which might shed some light on the issues presented by this action. This objection is overruled, and the order entered today will be a final order disposing of this action.

The relevant facts as stipulated by the parties are here summarized. Pursuant to the Revenue Sharing Act, which went into effect on October 20, 1972, the City of Atlanta received approximately $5,962,169 in revenue sharing funds for the year 1972. It has been anticipated that the City will receive approximately an additional $1.5 million in Revenue Sharing funds per quarter for the first three quarters of 1973. At a meeting of the Board of Aldermen of the City of Atlanta on December 18, 1972, the Board adopted, and Mayor Massell subsequently approved, a resolution of intention which provided in part as follows:

> Now, therefore, be it resolved by the Mayor and Board of Aldermen of the City of Atlanta, Georgia, that it is the intention of the Mayor and Board of Aldermen to utilize approximately $4,500,000.00 of these funds made available by the application of Federal Revenue Sharing funds to the City's fiscal requirements, to provide some form of meaningful tax relief for the citizens of the City of Atlanta.

At the same meeting ordinances were adopted which carried out the purpose of defendants to provide some sort of tax relief. One ordinance provided that all of the Revenue Sharing funds for 1972 would be used to pay firemen's salaries; a second ordinance provided that $4.5 million of the Revenue Sharing funds anticipated for 1973 were likewise to be assigned to a Trust and Agency Fund for the payment of firemen's salaries.

At a meeting of the Board of Aldermen on February 5, 1973, an ordinance was adopted authorizing a reduction of $4.5 million in the water/sewer rates to be charged to the firms and individuals in the City having water accounts as of January 31, 1973,[1] and authorizing the Director of Finance of the City to transfer from the General Fund of the City to the Water/Sewer Fund such monies as might be necessary to replace the total monthly monetary reduction resulting from the credits to all water/sewer accounts. Defendant Massell approved this ordinance on February 6, 1973.

The effect of the above-described ordinances is as follows: The Revenue Sharing funds received for 1972 are to be utilized to raise firemen's salaries, an approved use under the Revenue Sharing

---

1. The water/sewer reduction, or rebate, is not in any way tied to the amount of water consumed. Rather, each water/sewer account, whether residential, commercial or industrial, is to be given the same rebate, amounting to $44 over a period of 11 months.

Act. The $4.5 million in Revenue Sharing funds anticipated for the first three quarters of 1973 is likewise designated as being used to pay firemen's salaries, thereby relieving the general fund of this obligation. The $4.5 million from the general fund originally slated for the payment of firemen's salaries is then to be transferred to the City's Water/Sewer Fund to reimburse it for the $4.5 million reduction in the Water/Sewer Fund resulting from the rebate conferred upon firms and individuals having water accounts with the City. It is the Revenue Sharing funds anticipated for the first three quarters of 1973 (a total of $4.5 million) which are to be used to release the $4.5 million in general funds which defendants propose to disburse in the form of a water/sewer rebate.

In his State of the City Annual Message, delivered on Tuesday, January 2, 1973, defendant Massell stated that he intended to return directly to the citizenry of Atlanta a portion of the Revenue Sharing funds in the amount of $4.5 million. On February 12, 1973, in a news release, defendant Massell announced that he was going to use the Revenue Sharing funds at least in part to "create some relief for the monthly budget of the average Atlanta householder . . . [T]his has made it possible for us to reduce the water/sewer rates on over 100,000 accounts by $4 per month per meter . . . a total benefit to the public of $4.5 million." Affidavits from three defendants, members of the Board of Aldermen, state that the series of ordinances described above was designed to carry out a plan to return $4.5 million of Federal Revenue Sharing funds to firms and individuals having active water/sewer accounts with the City of Atlanta.

Plaintiffs claim that the actions of the defendants, as set forth above, constitute a violation of § 103(a) of the Revenue Sharing Act, which provides as follows:

(a) In general.—Funds received by units of local government under this sub[title] may be used only for priority expenditures. For purposes of this [title], the term "priority expenditures" means only—

(1) ordinary and necessary maintenance and operating expenses for—

(A) public safety (including law enforcement, fire protection, and building code enforcement),

(B) environmental protection (including sewage disposal, sanitation, and pollution abatement),

(C) public transportation (including transit systems and streets and roads),

(D) health,

(E) recreation,

(F) libraries,

(G) social services for the poor or aged, and

(H) financial administration; and

(2) ordinary and necessary capital expenditures authorized by law.

It is plaintiffs' contention that defendants have violated the Act by, in effect, spending $4.5 million for water/sewer rebates, which is not one of the priority uses set forth in § 103(a).

Plaintiffs also argue that defendants' actions will deprive certain of the plaintiffs, those who do not have water/sewer accounts, of equal protection of the law. It is also contended that the actions of defendants, if not enjoined, would constitute violations of certain provisions of the Constitution of the State of Georgia. Plaintiffs seek a preliminary and permanent injunction restraining the defendants from utilizing the Revenue Sharing funds in the manner proposed by defendants.

The threshold question in this controversy, as in every action in federal court, is whether this court, consistent with the constitutional and statutory limits on its power, can assert jurisdiction over the action.

Article III of the Constitution limits the judicial power of federal courts to

the decision of "cases" and "controversies." As described by the Supreme Court in Flast v. Cohen, 392 U.S. 83, 94–95, 88 S.Ct. 1942, 1949, 20 L.Ed.2d 947 (1968):

> [T]hose two words have an iceberg quality, containing beneath their surface simplicity, submerged complexities which go to the very heart of our constitutional form of government. Embodied in the words "cases" and "controversies" are two complementary but somewhat different limitations. In part those words limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process. And in part those words define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government. Justiciability is the term of art employed to give expression to this dual limitation placed upon federal courts by the case-and-controversy doctrine.

As the plaintiffs here attack the actions of local officials, this court is not faced with the often difficult problem of determining whether assertion of jurisdiction would intrude upon functions solely within the power of the other co-equal branches of federal government. As early as Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), the Court distinguished municipal taxpayers' actions, which had been entertained by the Court, from an attack on a federal statute based solely upon plaintiff's status as a federal taxpayer, which the Court in *Frothingham* dismissed for lack of a case or controversy.

The question remains, however, whether plaintiffs here have sufficient standing to satisfy the second aspect of the case-or-controversy requirement of Article III. Flast v. Cohen, *supra*, 392 U.S. at 99, 88 S.Ct. at 1952 held that:

> The "gist of the question of standing" is whether the party seeking relief

has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

The requisite personal stake is more easily demonstrated in a taxpayers' action against *municipal* spending than in actions against state or federal legislation for, as the Supreme Court noted in *Frothingham,* 262 U.S. at 486–487, 43 S.Ct. at 601,

> The interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate. It is upheld by a large number of state cases and is the rule of this court. Crampton v. Zabriskie, 101 U.S. 601, 609, 25 L.Ed. 1070 . . . The reasons which support the extension of the equitable remedy to a single taxpayer in such cases are based upon the peculiar relation of the corporate taxpayer to the corporation, which is not without some resemblance to that subsisting between stockholder and private corporation. 4 Dillon, Municipal Corporations (5th Ed.) § 1580 et seq.

■ Nonetheless, it is clear that plaintiff taxpayers must show a financial interest in the controversy in order to maintain standing as taxpayers. Thus in Doremus v. Board of Education, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952), the Supreme Court held that, the plaintiffs, taxpayers of New Jersey, did not have standing as taxpayers to challenge a state statute which provided for reading of the Old Testament at the opening of each public-school day because, as the action complained of did not increase taxes nor add to the costs of conducting the schools, plaintiffs had only a religious, not a financial, opposition to the statute. The Court went on to say, however, that if plaintiff-taxpay-

ers are able to demonstrate a financial injury, it is of no consequence that the main inducement to action is not mercenary but religious. Thus the Supreme Court has found the requisite standing in cases brought by state taxpayers to challenge state programs of aid to non-public schools. See Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947); *See also,* Fuller v. Volk, 351 F.2d 323 (3rd Cir. 1965); Jaffee, "Standing to Secure Judicial Review: Public Actions", 74 Harv.L.Rev. 1265, 1307–1312 (1961).

Plaintiffs in the present case have standing, then, only if they can demonstrate injury to them as taxpayers as a result of the allegedly illegal actions of defendants. For purposes of determining standing the court must, of course, assume that plaintiffs can prove that defendants' proposed actions are illegal.

The requisite financial harm to the taxpayers of the City of Atlanta is found in the Revenue Sharing Act itself. Section 123(a) of the Act provides in relevant portion as follows:

> Assurances to the Secretary.—In order to qualify for any payment under sub[title] A [Allocation and Payment of Funds] for any entitlement period beginning on or after January 1, 1973, a State government or unit of local government must establish (in accordance with regulations prescribed by the Secretary, and, with respect to a unit of local government, after an opportunity for review and comment by the Governor of the State in which such unit is located) to the satisfaction of the Secretary that—
>
> .   .   .   .   .   .
>
> (3) in the case of a unit of local government, it will use amounts in such trust fund (including any interest earned thereon while in such trust fund) only for priority expenditures (as defined in section 103(a)), and will pay over to the Secretary (for deposit in the general fund of the Trea-

sury) an amount equal to 110 percent of any amount expended out of such trust fund in violation of this paragraph, unless such amount is promptly repaid to such trust fund (or the violation is otherwise corrected) after notice and opportunity for corrective action;

.   .   .   .   .   .

The statute thus provides for a return of any Revenue Sharing funds spent in violation of the priority use requirements set forth in § 103(a), plus a penalty of 10%. If defendants were to carry out their proposed plan to rebate $4.5 million of the Revenue Sharing funds and if, as plaintiffs allege, such use is in violation of § 103(a), the City would be liable to the Secretary of the Treasury for $4.5 million plus 10%, a total of $4.-95 million. Even if the Secretary were to find the rebate program illegal after only the first installment thereof had been paid, the City would then be required to pay back approximately $400,000 plus 10%. Such funds could come only from the taxpayers who are plaintiffs in this action. Even if the defendants were able to avoid the 10% penalty by repaying the misspent amounts promptly, such repayment could come only from the general funds of the City, for prompt recollection of the water rebates from each firm and individual who had an active water/sewer account as of January 31, 1973, would clearly be physically impossible. In that event, plaintiffs as taxpayers would be the source from which defendants would restore the resultant $4.5 million deficit in the City's general funds. While plaintiffs have not alleged the injury which would result from these provisions, the court is free to note that the operation of § 123(a) would impose a financial injury upon the general funds of the City and upon the class of plaintiff taxpayers.

■ As a result of § 123(a)(3) of the Revenue Sharing Act which imposes a penalty for violation of § 103(a) of the Act by a local government, the court holds that a taxpayers' complaint which

alleges that a local government has spent Revenue Sharing funds in violation of the priority use requirements of § 103(a) constitutes a case or controversy within the meaning of Article III.

Having found that the complaint satisfies the constitutional jurisdictional standard, the court must now determine whether this action falls within the statutory limits on the court's jurisdiction. Plaintiffs assert jurisdiction on the basis of 28 U.S.C. § 1331, federal question jurisdiction, and 28 U.S.C. §§ 1343(3) and (4), which provide for jurisdiction over suits authorized by the civil rights statutes.

■ As plaintiffs' claim of violation of the Revenue Sharing Act clearly arises under the laws of the United States, jurisdiction is conferred on the court by 28 U.S.C. § 1331, so long as the matter in controversy exceeds the sum or value of $10,000.00. As set forth above in the discussion on standing, the class of plaintiff-taxpayers as a whole stands to suffer injury in the amount of at least $400,000 [2] by operation of law should the defendants carry out their proposed plan, assuming as we must for jurisdictional purposes that plaintiffs will prevail on the merits. It is equally clear, however, that no single member of the class will stand to suffer in the amount of $10,000.00. The question, then, is whether the claims of the members of the plaintiff class may be aggregated to determine jurisdictional amount.

In the recent case of Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969), the Supreme Court held that the 1966 amendment to Rule 23, Fed.R. Civ.P., dealing with class actions, did not effect any change in the traditional jurisdictional rule that

[T]he separate and distinct claims of two or more plaintiffs cannot be aggregated in order to satisfy the jurisdictional amount requirement. Aggregation has been permitted only (1)

in cases in which a single plaintiff seeks to aggregate two or more of his own claims against a single defendant and (2) in cases in which two or more plaintiffs unite to enforce a single title or right in which they have a common and undivided interest. 394 U.S. 332 at 335, 89 S.Ct. 1053 at 1056.

This court is thus faced with the problem of determining whether the claims asserted here are joint and common or whether they are separate and distinct. The distinction is not always readily discernible. *See generally,* Wright, Law of Federal Courts, § 72 at 315–16.

Plaintiffs in the present case are not asserting that they individually are entitled to all or any part of the Revenue Sharing funds. In fact they are seeking to prevent defendants from distributing such funds in a manner which would personally benefit many of them. They claim a right to prevent their elected officials from utilizing a portion of the Revenue Sharing funds in violation of federal law. As discussed above, the alleged violation of federal law would result in financial harm to plaintiffs, but it is a financial harm which they would suffer in common.

■ This case is thus clearly distinguishable from an action in which a property owner seeks to enjoin collection of an assessment levied against his property; in such a suit the object is relief for each property owner. The interests are separate and distinct and therefore not aggregable. Russell v. Stansell, 105 U.S. 303, 26 L.Ed. 989 (1881); 3B J. Moore, Federal Practice, ¶ 23.13 at 2960. Similarly, in Gas Service Company v. Coburn, decided by the Supreme Court along with Snyder v. Harris, *supra,* Coburn sued to recover damages for the allegedly illegal collection of a city franchise tax from him and others living outside the city limits. As such claim was clearly personal to Coburn and distinct from the claims of others

---

**2.** If the defendants' actions were found illegal by the Secretary of the Treasury after payment of only one installment of the rebate.

who had paid the tax the Supreme Court refused to permit aggregation.

In contrast stands the case of Brown v. Trousdale, 138 U.S. 389, 11 S.Ct. 308, 34 L.Ed. 987 (1891), in which plaintiff sued on behalf of himself and all other taxpayers of the county to have a series of bonds declared invalid and to enjoin permanently the collection of the tax to provide interest on the bonds. The Supreme Court pointed out that "the relief sought could not be legally injurious to any of the tax payers of the county." At 394, 11 S.Ct. at 310. This, coupled with the consideration that the main issue was not the enjoining of a tax for a single year but the validity of the bond issue as a whole, made the grievance common to all and permitted aggregation of the claims of all taxpayers of the county.

■ Defendants would have the court hold that aggregation of claims is never permitted in taxpayer actions. There are indeed many such actions in which the Court has found the claims to be separate and therefore denied aggregation,[3] and defendant has directed the court's attention to one lower court decision holding that aggregation is never proper in taxpayers' actions relating to property rights.[4] This court, however, believes that no such absolute rule is discernible from the relevant cases. In taxpayers' actions, just as in any other kind of action, it is the character of the right asserted which controls on the issue of aggregation. *See* Berman v. Narragansett Racing Association, 414 F.2d 311 (1st Cir. 1969). In most taxpayers' actions aggregation has not been allowed for jurisdictional purposes simply because most taxpayers' suits are brought to assert a personal and individual claim. Professor Moore expresses the rule as follows:

> If the action was based on a public right, and not upon a right peculiar to the plaintiff, the action was upon a right held in common; it was a true class action; the amount in controversy was the aggregated claims of the class, that is, the public's claim. On the other hand if the rights involved were peculiar to the individual taxpayers, as usually they were, the action was upon several rights; it was a spurious class action; the claims could not be aggregated, but the claim of each plaintiff of record had to exceed the jurisdictional minimum. 3B J. Moore, Federal Practice, § 23.13 at 2959–60 (citations omitted).

The crux of plaintiffs' action is a suit to require the defendants to comply with the provisions of the Revenue Sharing Act in the disbursement of those funds. Plaintiffs do not challenge the assessment of taxes against them individually but instead express an interest in insuring that a large fund of revenues be spent in a lawful manner. Further, plaintiffs by this suit seek to prevent the forfeiture of those funds and/or the imposition of a penalty. Such forfeiture or penalty would cause injury to the general funds of the City and to the plaintiffs as a class of citizens and taxpayers. Violation of the restrictions of the Revenue Sharing Act would be detrimental to the City, to the named plaintiffs and to the entire class of plaintiffs. The right asserted is thus of a public nature, held in common and indivisible; aggregation of the claims of the plaintiff class is therefore proper and the jurisdictional amount is clearly met.

■ The court must now proceed to a consideration of the merits of plaintiffs'

---

3. *E. g.* Clark v. Paul Gray, Inc., 306 U.S. 583, 59 S.Ct. 744, 83 L.Ed. 1001 (1939); Williams v. Riley, 280 U.S. 78, 50 S.Ct. 63, 74 L.Ed. 175 (1929); Scott v. Frazier, 253 U.S. 243, 40 S.Ct. 503, 64 L.Ed. 883 (1920); Russell v. Stansell, 105 U. S. 303, 26 L.Ed. 989 (1881); Fuller v. Volk, 351 F.2d 323 (3rd Cir. 1965).

4. Booth v. Lemont Manufacturing Corp., 304 F.Supp. 235 (N.D.Ill.1969); *cf.* Lynch v. Household Finance, 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972), in. which the Supreme Court did away with the "personal rights-property rights" distinction.

claim that the proposed plan of defendants to distribute a water/sewer rebate is in violation of § 103(a) of the Revenue Sharing Act. It is clear from § 103(a), and defendants do not contend otherwise, that the defendants could not have directly used any portion of the Revenue Sharing funds to make a rebate to those with water/sewer accounts. A water/sewer rebate does not fall within one of the "priority" uses permitted by § 103(a).

Defendants do contend, however, that they have fully satisfied their duties under the Act by placing the Revenue Sharing funds in a trust account for the payment of firemen's salaries, a priority use. It is their position that the Revenue Sharing Act imposes restrictions only on the specific funds which are received by operation of the Act. They contend that the Act imposes no restrictions upon the City's general funds which are freed up by the influx of Revenue Sharing funds. Thus in the present case they state that $10.5 million of general funds would have been used for the payment of firemen's salaries, but for the receipt of the Revenue Sharing funds. Defendants contend that use of the Revenue Sharing funds for firemen's salaries allows them to make any use whatsoever of the general funds which would otherwise have been put to such use.

It is true that the Revenue Sharing Act does not specifically impose any restrictions upon the use of legitimately freed-up funds. Thus the Act seems clearly to have contemplated that the infusion of Revenue Sharing funds into state and local governments would permit future tax relief to the hard-pressed taxpayers of those governments.[5] Further, there is no requirement that a local government maintain at pre-Revenue Sharing levels its spending on "priority expenditures." There is a clear difference, however, between funds which are legitimately freed up by the designation of federal Revenue Sharing funds to provide municipal services which otherwise would have to have been paid for out of general City funds, and funds which are transferred from one account to another simply to avoid the restrictions imposed by § 103(a) of the Act. The actions of defendants, the public statements made by defendant Mayor Massell and the affidavits of three of the defendant members of the Board of Aldermen, show clearly that the steps taken by defendants were designed to carry out a plan to return $4.5 million in Revenue Sharing funds to certain taxpayers, the defendants having decided to confer such tax relief by way of rebates on the water/sewer accounts.[6]

█ Such an attempt to avoid the clear restrictions of a federal statute cannot be accepted. While there is, as yet, no case law on the Revenue Sharing Act, in the interpretation of federal statutes generally, the courts have long made it clear that Congressional intent cannot be overridden by sham transactions. In the areas of federal income taxation,[7] securities law,[8] and antitrust

---

5. *See* Comments by Representative Wilbur Mills in debate on the Conference Report on the Bill, Conference report on H.R. 14370, State and Local Fiscal Assistance Act of 1972, Congressional Record—House, October 12, 1972, p. H-9744.

6. In this connection it is interesting to note that defendants have conceded that use of the $4.5 million to reduce *ad valorem* taxes would have deprived the City of future Revenue Sharing funds, because the *ad valorem* tax effort of the City constitutes one factor in the formula by which Revenue Sharing funds are allocated to local governments. Section 109 (e). Defendants have thus sought to avoid the effect of the reduction of Revenue Sharing funds which would result from a more orthodox method of tax relief.

7. *See e. g.,* Knetsch v. United States, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960) ; Bazley v. Commissioner, 331 U. S. 737, 742–743, 67 S.Ct. 1489, 91 L.Ed. 1782 (1947) ; Minnesota Tea v. Helvering, 302 U.S. 609, 613, 58 S.Ct. 393, 82 L.Ed. 474 (1938) ; Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935).

8. *See, e. g.,* SEC v. Micro-Moisture Controls, Inc., 148 F.Supp. 558 (S.D.N.Y. 1957), final injunction, 167 F.Supp. 716

statutes [9] the courts have consistently refused to exalt artifice over reality or to ignore the actual substance of a particular set of transactions. Thus the court must recognize that the defendants have merely transferred funds from one account to another in an effort to disguise the fact that they plan to distribute $4.5 million of Revenue Sharing funds to the holders of water/sewer accounts.

■ Defendants would seem to argue, however, that their proposed plan does not conflict with Congressional intent. Defendants, while recognizing the restrictions set forth in § 103(a), contend that such restrictions were not meant to have any force and that thus defendants' proposal to circumvent those provisions would not actually run counter to the intent of Congress. Defendants' contention that Congress intended no effective restrictions on the funds is clearly belied by an examination of the legislative history of the Act.

The final version of the Act, worked out in conference, was a compromise between differing versions of the Act which had been passed in the House and Senate. The original House bill had adopted a restrictive definition of priority expenditures which permitted Revenue Sharing funds to be used only for ordinary and necessary maintenance and operating expenses for public safety, environmental protection, and public transportation, and for capital expenditures for sewage collection and treatment, refuse disposal systems, and public transportation. The Senate had amended the bill to remove all restrictions upon the uses for which a local government could spend the funds. The Senate

position was not adopted in the final legislation; a compromise was worked out whereby the House insistence upon restrictions was adhered to but, to satisfy the Senate, the categories of priority expenditures were expanded. The fact that the language of § 103(a) is identical to the language of the original House version of the bill, except for a broader list of priority expenditures, clearly demonstrates that the restriction of the funds to priority expenditures was to be taken seriously.

Representative Wilbur Mills made the following statement to the House in explanation of the compromise worked out in conference:

Let me turn now to the vital question of how the local governments are to spend the aid funds. This constituted one of the major differences between the Senate and House bills. The Senate bill contains no guidance as to how the local governments are to spend the amounts distributed to them under the bill. This is in marked contrast with the House bill which requires local governments to spend the aid funds on a specified list of high priority items. This, of course, is in accord with the principle that if the Federal Government is to provide aid to the local governments, it should provide guidance as to how the funds are to be spent. The objective is to insure that the funds shall be spent for socially useful purposes which have a high priority among the various public needs.

*In view of the importance of providing Federal guidance as to the spending of local aid funds your conferees were adamant that the bill should provide such guidance. As a result, the*

(S.D.N.Y.1958), aff'd sub nom. SEC v. Culpepper, 270 F.2d 241 (2nd Cir. 1959) ; Great Sweet Grass Oils, Ltd., 37 SEC 693 (1957), aff'd per curiam sub nom. Great Sweet Grass Oils, Ltd. v. SEC, 256 F.2d 893 (D.C.Cir.1958).

9. *See, e. g.*, Simpson v. Union Oil Co., 377 U.S. 13, 24, 84 S.Ct. 1051, 1058, 12 L.Ed. 2d 98 (1964), where the Court stated as follows :

To allow Union Oil to achieve price fixing in this vast distribution system through this "consignment" device would be to make legality for antitrust purposes turn on clever draftsmanship. We refuse to let a matter so vital to a competitive system rest on such easy manipulation.

*conference report contains a specified list of priority expenditures on which local governments can spend the aid funds.* Under the conference report, the list of priority expenditures is expanded to include necessary maintenance and operating expenses for health, recreation, libraries, social services for the poor and aged and financial administration, which were not included in the House bill. In addition, under the conference bill, all ordinary and necessary capital expenditures authorized by law—and not just a limited group—are treated as priority expenditures or, in other words, as permissible expenditures for local governments. Cong.Rec. p. H–9743 (October 12, 1972). (Emphasis added.)

Clearly then the list of priority expenditures for which Revenue Sharing funds may be used is no mere happenstance but the result of careful compromise. The Senate was unable to remove the restrictions on the use of Revenue Sharing funds by local governments; the defendants cannot by their proposed plan achieve what the United States Senate tried and failed to accomplish.

If defendants were to prevail on their arguments, other statutory restrictions placed on the use of Revenue Sharing funds would likewise become meaningless. This court cannot conclude that Congress intended for its prohibition against the use of the funds in a manner that discriminates on the basis of race, color, national origin or sex (§ 122) to be so easily read out of the Act. Similarly, the restrictions set forth in §§ 123(a)(6) and 123(a)(7), establishing standards for wages paid with Revenue Sharing funds, and § 123(a)(8), requiring that funds received by certain local governments be expended for the benefits of certain Indian tribes, would be nugatory according to defendants' analysis of the Act.

Defendants seek to bolster their argument regarding § 103(a) by comparing that section to § 104(a), which provides that

No State government or unit of local government may use, *directly or indirectly,* any part of the funds it receives under this subtitle as a contribution for the purpose of obtaining Federal funds under any law of the United States which requires such government to make a contribution in order to receive Federal funds. (Emphasis added.)

Defendants contend that the use of the words "directly or indirectly" in § 104(a) indicates that Congress was serious about the restriction against the use of Revenue Sharing funds to obtain matching funds but was not serious about the priority uses set forth in § 103(a). Such analysis ignores the legislative history of the Act. The provision against the use for matching funds was originally contained in the House Bill but was limited to prohibiting the use by a local government of Revenue Sharing funds as contributions made from "non-Federal" funds for purposes of matching grants. The Senate expanded this limitation to include a prohibition against matching with both federal or non-federal funds, and to include funds received by state governments as well as local governments. In the process of redrafting, the language "directly or indirectly" was added, with no indication that the construction of the limitation itself was intended to be changed other than to broaden the matching grant categories for which the Revenue Sharing funds could not be used. The differing legislative history of § 103(a) and § 104(a), and the fact that no comparison between the language of the two sections or indication of the possible significance of the difference in the wording is found, convince the court that Congress did not intend for the language of § 104(a) to carry a hidden key to the correct interpretation of § 103(a).

One final argument by defendants is that § 103(a) has no effect because it is so difficult to enforce. They draw support for this argument from the Senate report on the Senate version of the bill, in which the committee justi-

fied the Senate's deletion of the restrictions on a local government's use of the funds by the argument that enforcement of the restrictions would be impossible and that therefore any restrictions would be illusory. And facially this argument is persuasive, but, as noted above, it was in effect overruled by the action of the House-Senate conference and by the passage of the Act in its present form by both houses of Congress. Moreover, the Act itself provides an enforcement mechanism by requiring the Secretary of the Treasury to establish accounting and auditing procedures (§ 123(c)) and also by providing for imposition of a penalty if funds are spent in violation of § 103(a).

Defendants seek support from a recent article on Revenue Sharing published in the Harvard Journal on Legislation. "The Revenue Sharing Act of 1972: Untied and Untraceable Dollars from Washington", 10 Harv.J.Legis. 276 (1973). In discussing the priority expenditures provision of the Act, the article makes the point that violations of § 103(a) will be extremely difficult to discover and prove, for Revenue Sharing funds will be commingled in fact with other local funds, even if the books of account are kept separately. Such problems of proof will undoubtedly arise; however, in the present case the use of Revenue Sharing funds in violation of § 103(a) has been clearly proved by plaintiffs, in large part by the statements of defendants themselves.

In conclusion then, the court has looked to the substance of defendants' actions and determined that defendants' proposed plan would entail the expenditure of federal Revenue Sharing funds for other than one of the priority expenditures set forth in § 103(a). The court has further determined that it was the intent of Congress that local governments be permitted to expend federal Revenue Sharing funds only on priority expenditures as defined in § 103(a). In light of this determination the court need not consider plaintiffs' other claims.

Accordingly, judgment is hereby entered for the plaintiffs. Defendants, their agents, employees, successors in office and attorneys are hereby permanently, enjoined from utilizing $4.5 million in Revenue Sharing funds in the manner proposed, that is, to make a reduction in water/sewer rates or to give a rebate to all those with active water/sewer accounts.

It is so ordered.