Joyce **GOOLSBY, Individually and on behalf of all others similarly situated, Plaintiffs-Appellants,**

v.

W. Michael **BLUMENTHAL, as Secretary of the Department of the Treasury, et al., Defendants-Appellees.**

No. 76–2198.

United States Court of Appeals, Fifth Circuit.

March 9, 1979.

Steven F. Granberg, Gerald R. Tarutis, Emerson R. Marks, Jr., Alfred O. Bragg, III, Georgia Legal Services Programs, Macon, Ga., James A. Kushner, Los Angeles, Cal., Jack Greenberg, Charles E. Williams, III, New York City, for plaintiffs-appellants.

F. Robert Raley, Andrew W. McKenna, City Atty., Macon, Ga., Robert E. Kopp, Appellate Staff, Bruce G. Forrest, Neil H. Koslowe, Civ.Div., Dept. of Justice, Washington, D. C., for defendants-appellees.

Stephen C. Chapple, U. S. Conference of Mayors, John P. Lagomarcino, Legislative Director and General Counsel, Washington, D. C., for Nat. Governors' Ass'n Amicus Curiae.

Before BROWN, Chief Judge, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN and VANCE, Circuit Judges.*

PER CURIAM:

There having been a rehearing of this case en banc, it is the judgment of the court that the judgment of the district court from which this appeal is taken be and the same is AFFIRMED.

The en banc court adopts as its opinion all of the dissenting panel opinion of Judge Homer Thornberry except for the final portion thereof, designated paragraph IV.[1]

The panel dissenting opinion adopted by the en banc court is attached as an appendix.

Accordingly, the judgment of the district court is

AFFIRMED.

---

* Judges Thornberry and Morgan served on the three-judge panel which initially considered this case, and each wrote an opinion. *See Goolsby v. Blumenthal,* 581 F.2d 455 (5th Cir. 1978). Subsequently, the Omnibus Judgeship Bill, Public Law 95–486 (95th Congress) was approved October 20, 1978. In view of this, Judges Thornberry and Morgan did not participate in this decision.

1. Paragraph IV of the panel dissent was devoted to an issue which would be appropriate were the district court's judgment reversed. That alternative issue need not be, and is not, reached by the court en banc.

1. 31 U.S.C. § 1221 *et seq.*

2. S.Rep. No. 92–1050, 92d Cong., 2d Sess., reprinted in 1972 U.S.Code Cong. and Admin. News, p. 3874.
   Of course, the phrase no strings can be read in a narrow manner. For such a reading see Kushner and Werner, *Revenue Sharing and Relocation: The Administrative Dilemma of Ostensibly Conflicting Congressional Directives,* 5 Ecology L.Q. 433, 438–442. Interestingly, the

APPENDIX

THORNBERRY, Circuit Judge, Dissenting:

Judge Morgan's opinion for the majority reflects careful and serious scholarship. I must, however, respectfully dissent.

One need read only six lines of the legislative history of the State and Local Assistance Act of 1972 (Revenue Sharing Act)[1] to see the phrase "no strings."[2] Although I have no desire to exult the phrase "no strings" into a needless shibboleth distinguishing as did Jephthah between the impermissible strings of the Ephraimites and the permissible strings of the Gileadites,[3] I think the phrase is a useful description of the purpose of the Revenue Sharing Act. Since I believe that the Revenue Sharing Act is such a radical departure from the funding measures traditionally used by the federal government, I think there is an irreconcilable conflict between the demands of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (URA)[4] and the program contemplated by revenue sharing. Furthermore, I conclude that the policy of both the URA and the Revenue Sharing Act cannot both be advanced without diminishing the force

---

plaintiff's brief in this case is an edited version of this law review article.

3. Appropriately, I have borrowed from Judges 12:4–6.
   4. Then Jephthah gathered together all the men of Gilead, and fought with Ephraim: and the men of Gilead smote Ephraim, because they said, Ye Gileadites are fugitives of Ephraim among the Ephraimites, and among the Manassites.
   5. And the Gileadites took the passages of Jordan before the Ephraimites: and it was so, that when those Ephraimites which were escaped said, Let me go over; that the men of Gilead said unto him, Art thou an Ephraimite? If he said, Nay;
   6. Then said they unto him, Say now Shibboleth: and he said Sibboleth: for he could not frame to pronounce it right. Then they took him, and slew him at the passages of Jordan: and there fell at that time of the Ephraimites forty and two thousand.

4. 42 U.S.C. § 4601 *et seq.*

of the Revenue Sharing Act. Finally, I think that Congress intended that the Revenue Sharing Act be free from the encumbrances such as the URA historically associated with block grants.

In my conclusion that the URA does not apply to revenue sharing funds, I rely on three arguments. First, the institutional function and administration of the URA is so far afield from the program contemplated by Congress for revenue sharing as to make the teeth of the URA not fit into the gear of revenue sharing. Second, although as Chief Judge Brown has succinctly noted, the legislative history of the Act is not completely clear, I think that the history of the Act is such as to justify the conclusion that Congress intended the Revenue Sharing Act to float on its own bottom and not be encumbered by the sargasso of some foreign sea. Last, I think that Congress by failing to override a parallel decision of a sister circuit regarding the applicability of the National Environmental Policy Act of 1969 (NEPA)[5] to revenue sharing funds has adopted the rationale of *Carolina Action v. Simon*[6] that only the acts specifically mentioned in the body of the Revenue Sharing Act are applicable to the revenue sharing program.

## I.

## THE CONFLICTING POLICIES OF THE TWO ACTS.

The majority notes that "[t]he mechanical implementation of the programs required by the URA would certainly pose no more problems when arising in the context of a revenue sharing project than when arising in the context of any other state program receiving federal aid." Slip Opinion at 53. I do not share the majority's optimism. I think that revenue sharing and block grants are vastly different programs and the majority does not fully appreciate the difficulties associated with the tandem administration and implementation of the two Acts. To demonstrate my point, briefly, I wish to note the disparate funding and review mechanism contemplated by the URA and by revenue sharing. Furthermore, I wish to predict the problems that will arise in the enforcement of today's decision.

Under the Revenue Sharing Act, payments are automatically made once the proper assurances under Section 1243(a) of the Act are received. These assurances are minimal. The recipients must submit a report on the planned use of revenue sharing funds.[7] This is a very short and non-detailed report, and the recipients must give assurances that they will use the accepted accounting procedure[8] and will spend the revenue sharing money in compliance with the Act.[9] Furthermore, the Act contains only three express prohibitions. First, revenue sharing funds cannot be used to match federal funds under another federal program.[10] Second, the recipients must follow the anti-discrimination provision specifically contained in the Act.[11] Last, the recipients must follow the modified version of the Davis-Bacon Act also contained in the body of the Act.[12]

On the other hand, Section 4630 of the URA declares that "[t]he head of a Federal agency shall not approve any grant . . . unless he receives satisfactory assurances from such State agency that—[the URA will be followed]." This contemplates discretionary federal approval and specific requests to fund specific projects. The Revenue Sharing Act imposes no such federal review. I am at a loss to understand how these two Acts can work in consort if one Act provides for automatic distribution and

5. 42 U.S.C. § 4321 *et seq.*

6. 389 F.Supp. 1244 (M.D.N.C.), *aff'd per curiam,* 522 F.2d 295 (4 Cir. 1975).

7. 31 U.S.C. § 1241(b).

8. 31 U.S.C. § 1243(a)(5)(A).

9. 31 U.S.C. § 1243(a)(3).

10. 31 U.S.C. § 1223.

11. 31 U.S.C. § 1242.

12. 31 U.S.C. § 1243(a)(6). Local recipients must also honor the priority expenditures of 31 U.S.C. § 1222(a). There is no similar requirement for state governments.

the other Act contemplates prior federal approval for specifically proposed projects. The distinguishing feature between the two Acts is that the URA envisions federal control over a funded project while revenue sharing does not. The Fourth Circuit correctly noted this in *Ely v. Velde,* 497 F.2d 252, 256 (4 Cir. 1974), when it declared, "A block grant is not the same as unencumbered revenue sharing, for the grant comes with strings attached."

Additionally, I see vast administrative problems in determining when a project is funded with revenue sharing money. Once revenue sharing money is distributed to local governments it is very difficult to determine how the money is actually spent. *See* Note, *The Revenue Sharing Act of 1972: Untied and Untraceable Dollars from Washington,* 10 Harv.J.Legis. 276 (1973). Certainly, there is the possibility of localities comingling federal and local funds, *see* 47 Notre Dame Lawyer 1042, 1056 (1972), and there is the possibility that revenue sharing funds would be diverted to projects that would not result in displacement thereby freeing purely local money for displacement projects. *See* Note, *The Application of Federal Environmental Standards to the General Revenue Sharing Program: NEPA and Unrestricted Federal Grants,* 60 Va.L. Rev. 114, 133 (1974).

13. Of course, courts are vigilant in guarding against sham transactions, *see Mathews v. Massell,* 356 F.Supp. 291 (N.D.Ga.1973), and *Named Individual Members of the San Antonio Conservation Society v. Texas Highway Dept.,* 446 F.2d 1013, 1028 (5 Cir.), *cert. denied,* 400 U.S. 968, 91 S.Ct. 368, 27 L.Ed.2d 388 (1971), but I do think that it is important to note that in both of these cases the courts' conclusion that the transactions were sham transactions was made easy by statements by public officials. In the future, the cases will not be so easy. To avoid the possibility of both careful avoidance and outright sham, several commentators have suggested that any local project that results in displacement be presumed to have been financed with federal money. *See* Kushner and Werner, Note 2, *supra,* 455–459. Therefore the localities would have the burden of proving that the displacement resulted from exclusively local money.

Of course, the fact that there are administrative difficulties in the enforcement of a law is certainly no reason to ignore the law.[13] However, I wish to point out a more significant factor regarding the difficulty of enforcement. Congress is fully cognizant of these enforcement problems[14] and yet does nothing about them. To me, it is incredible that Congress would not move against the enforcement problems unless the Congress thinks that there is no need— *i. e.,* there is no enforcement problem regarding other laws because no other law affects revenue sharing.

## II.

## LEGISLATIVE HISTORY.

I believe that there are three useful arguments that can be made regarding the legislative history of the Revenue Sharing Act. All three arguments point to the proposition that the Act was meant to exclude the applications of acts not specifically mentioned in the body of the Revenue Sharing Act. First, there is the disagreement between the House and the Senate regarding the scope of any supposed strings on revenue sharing money. I think that this debate and disagreement between the two views of revenue sharing demonstrate that all agreed as to the exclusive nature of revenue sharing but the House and Senate simply disagreed as to the scope of federal attachment contained in the body of the

14. Hearings on Revenue Sharing Before the Subcomm. on Intergovernmental Relations of the Senate Comm. on Governmental Operations, 93d Cong., 2d Sess., pt. 1, at 424 (1974).

Senator Muskie: Could they also be used to fund programs which could not be funded directly by revenue sharing under the law? Mr. Nathan: . . . You are right. The so called fungibility of public money permits state and local officials to use these financial resources interchangeably, and in doing so, because—and this is a phrase we have highlighted—because all money is green, there are opportunities for them to assign or attribute shared revenue to particular functions among the priority expenditure categories in the act, but not to add expenditures to that category and then to use shared revenue for some other purpose.

Act. Even the most insistent member in favor of federal strings—Representative Mills—limited his insistence to encumbrances in the body of the Act itself. Second, I think that congressional debate on the applicability of the Davis-Bacon Act, 40 U.S.C. § 276a *et seq.*, is instructive. Last, I think floor debate—particularly in the Senate—demonstrate that Congress knew that revenue sharing would be limited to the acts specifically mentioned.

A. The House-Senate Compromise Over Strings.

The most ardent supporter of federal control over the revenue sharing process was Representative Wilber Mills, the Chairman of the House Ways and Means Committee. Representative Mills' primary concern was the problem of separating the taxing function from the spending function. He reasoned that revenue sharing might create political bodies with money to spend thanks to revenue sharing but with no appreciation of the tax gathering efforts made by the federal government on their behalf. Pursuant to this view, the House bill imposed certain priority expenditures on the state and local governments. Revenue sharing money could be used for only three areas: safety, environmental protection, and public transportation.[15] Moreover, capital expenditures were limited to sewage collection, refuse disposal systems and public transportation.[16]

Even with this view of federal control over revenue sharing, the House Committee report made specific its desire not to oversee local expenditures down to minute detail:[17]

The basic purpose of the new assistance program is to help State and local governments finance their vital needs. In keeping with this objective, it is essential that the funds, in fact, be spent for high priority purposes. In its consideration of the problem, your committee studied a number of different approaches. On the one hand, it would theoretically have been possible for the legislation to insure that the aid funds are spent for desirable high-priority purposes by setting down minute and detailed specifications as to how the funds are to be spent. Your committee rejected this procedure, however, because it would defeat a major purpose of the new program, namely, to fill in a gap in the present categorical aid programs by providing a more flexible system of assistance.

On the other hand, the Senate, primarily under the leadership of Senator Russell Long, preferred a more liberal version of revenue sharing—one that would not spell out the permissible uses of revenue sharing monies. The Senate version of the revenue sharing bill did not attach any limitation on the use of revenue sharing money nor did the Senate bill create any priority categories.[18]

The Conference Report was a compromise between the two bills. The eventual law retained the priority concept but on a lesser scale than that established by the House bill. However, the Conference Report allowed normal capital expenditures.

The plaintiff suggests that since Representative Mills favored federal "strings" and since his view, albeit modified, eventually became law, the Revenue Sharing Act is merely another federal grant in aid pro-

15. 118 Cong.Rec. 35,896 (1972).

16. *Id.*

17. H.R.Rep. No. 92–1018, 92nd Cong., 2d Sess. 11 (1972).

18. S.Rep. No. 92–1050, 92 Cong., 2d Sess., pt. 1, at 3 (1972), 1972 U.S.Code Cong. & Admin. News at p. 3876. The Senate Report explained:
The House bill would have required the funds to be used only for a limited number of so-called high-priority purposes. On the other hand, the committee believes that one of the principal virtues of revenue sharing is the fact that this program is different from the categorical grant programs. If "no strings are attached," the funds may be spent by the local government for what the local citizenry recognize as their high priority purposes, rather than having priorities established by the Federal Government for them which would conflict with their own interests.

gram and Acts such as the URA are fully applicable to revenue sharing monies just as they are applicable to grant in aid programs. To me, this argument is wide of the mark. If there is to be an inference to be made from the House-Senate disagreement, it is not that revenue sharing is merely another grant in aid program; rather, it is that Representative Mills knew that revenue sharing funds would not be affected by any other federal law and he was careful to build into the body of the Act provisions that he thought necessary to protect federal interests. I cannot escape the conclusion that even though the Conference bill was a compromise, the Revenue Sharing Act that survived the House, the Senate, and the Conference Committee was self-contained; that is, any federal controls were embodied within the Act itself.

B. Davis-Bacon Debate.

Wisely, the majority does not accept the plaintiff's proffered explanation that the Davis-Bacon Act was included in the Revenue Sharing Act merely to modify its already general application. Not only does this explanation assume the ultimate fact to be proved—that other laws affect revenue sharing—it is erroneous history as well.

The legislative history in regard to the application of the Davis-Bacon Act reveals the following: the House bill, consistent with the House's general view of close federal review of revenue sharing monies, contained a provision that required state and local conformity with the Davis-Bacon Act as a part of revenue sharing. Indeed, if there is any reasonable inference to be made from the House's action, it is that the Davis-Bacon Act would not have applied absent the specific inclusion of the Act in the Revenue Sharing Act. Similarly, the inference must also be made that the URA does not apply to revenue sharing funds absent specific inclusion.

The Senate Committee, in making its objection clear, rejected the inclusion of the Davis-Bacon Act. However, Senator Vance Hartke introduced a floor amendment re-quiring the inclusion of the Davis-Bacon Act. 118 Cong.Rec. 29,511, 29,519 (1972). *See* Stolz, *Revenue Sharing—New American Revolution or Trojan Horse?*, 58 Minn. L.Rev. 1, 82–85 (1973), The Conference Committee then allowed a compromise version of the two views to become law. To accept the plaintiff's view is to say that the House acted redundantly by including the Davis-Bacon requirements as a part of the Revenue Sharing Act.

C. The Senate Debate.

I believe that the floor debate, particularly the support given the revenue sharing program by Senator Long, demonstrates that the Senate knew that the use of revenue sharing funds would not trigger the application of other related federal laws and standards. In response to Senator Hartke's amendment to make the provisions of the Labor Standards Act applicable to the 1964 Mass Transportation Act, Senator Long said: [19]

Mr. President, under the Senator's logic we can take every desirable condition that has been put on aid to education from the kindergarten to a post-graduate degree and say if 1 nickel of revenue-sharing money finds it way into the schools, colleges, or kindergartens, they must comply with all of those conditions. When you put those conditions on, they must pay the cost to comply. Here we say if even 1 nickel of revenue sharing gets into the hospital, for instance, it must comply with all of the conditions of the Hill-Burton Act; if 1 nickel gets into the highway program, all of the conditions of Federal aid to highways must be met. We have standards for the construction of sewers. The county would have to comply with all the Federal standards for the construction of a sanitary system. If they want to put in a day care center, they would have to comply with all the Federal conditions for day care centers. The problem is there are so many conditions that the local govern-

**19.** 118 Cong.Rec. 29,530–31 (1972).

ments could not comply with all of them without a tremendous burden, if they were to get even 1 nickel of revenue sharing money.

Those examples are just as logical as someone's union rights. There is no end to the conditions the minds of men could conceive along this line. If Senators are against the bill, they should vote for the amendment. These are the kinds of things that everybody agrees will kill revenue sharing—or the sort of conditions that local governments would find it difficult to comply with.

I believe the student author of Note, *General Revenue Sharing, NEPA, and the Bureaucratic Paper Shuffle: Must the Federal Government Prepare Environmental Impact Statements Prior to Local Spending Decisions?*, 25 Case W.Res.L.Rev. 797, 824, has accurately described the legislative history of the Revenue Sharing Act:

> In conclusion, while there is no clear evidence that in 1972 Congress specifically analyzed the interrelation of NEPA and revenue sharing, there is ample evidence that Congress considered and rejected as a general proposition the application of any federal standards other than those in the bill. For the courts to elevate NEPA over all other nondiscretionary statutory requirements and hold that it alone applies to the Revenue Sharing Act without express inclusion would infringe on Congress' legislative prerogative.

### III.
### CONGRESSIONAL FAILURE TO OVERRIDE CAROLINA ACTION.

In *Carolina Action v. Simon*, 552 F.2d 295, 296 (4 Cir. 1975), the Fourth Circuit rejected the plaintiff's argument that the Secretary of the Treasury was under a duty pursuant to NEPA and the Revenue Sharing Act to submit an environmental impact statement before disbursing revenue sharing funds earmarked by the local recipients for several capital improvements. In holding that NEPA did not apply to a project in which the only federal participation was the distribution of revenue sharing monies, the

court specifically adopted the lower court's memorandum opinion. The district court held, *inter alia*:

> Finally, an examination of the Revenue Sharing Act and its legislative history provides a final ground for dismissing this lawsuit. There is little dispute that the intent and objective of the Revenue Sharing Act was to return to the states and local communities revenues collected by the federal government so that the state and local governments could spend these funds according to their own perceived demands and objectives and not those of the federal government. This concept has been loosely referred to as a "no [federal] strings" approach to federal assistance as evidenced by pronouncements of the President and legislators involved in the Act's formulation. The Office of Revenue Sharing has so construed the Act as well, announcing that only federal standards set forth in the Act will be applied. 60 Va.L.Rev. at 123 n. 58. The defendants press on the Court the proposition that the fundamental no strings philosophy of this legislation precludes the application of NEPA to revenue sharing projects since the Revenue Sharing Act itself makes no mention of NEPA applicability although NEPA was then in effect.

> The plaintiff vigorously contends that the legislative history, while reflecting this "no strings" philosophy in the original perception of the Act, ultimately reveals a decision to place substantial federal controls on revenue sharing funds. They point to the Act itself and the significant federal restrictions imposed on a local community's use of funds.

> The Revenue Sharing Act does contemplate federal control at several stages. Sections 1241(b) and (c) request state and local governments to submit a report to the Secretary of the Treasury "setting forth the amounts and purposes for which it plans to spend or obligate the funds which it expects to receive . . ." before obtaining revenue sharing funds. This provision is apparently tied in with

the requirements that the funds be used only for priority expenditures, as defined in § 1222(a), that the projects funded be administered so as to ensure nondiscrimination and that the requirements concerning compliance with certain disbursement, auditing and reporting procedures and the fair labor standards of the Davis-Bacon Act be effectuated. 31 U.S.C. § 1243(a); § 1242. Penalties for noncompliance with these above requirements are set forth in the Act and include a 110 per cent repayment penalty for nonpriority expenditures and withholding of payments for other violations. 31 U.S.C. §§ 1243(a)(3), 1243(b). Other provisions provide methods by which the Secretary may monitor or evaluate compliance and thereby enforce the requirements. 31 U.S.C. § 1243(c), § 1241(a).

Despite this impressive array of federal involvement in the Revenue Sharing procedure, the Court is not persuaded that another significant and conspicuous federal act, namely NEPA, should be read into the requirements for disbursement of revenue sharing funds. The requirements enumerated above relate exclusively to compliance with specifically designated priority uses and specifically named laws. The planned use report does not relate to the amount of money to be received and, more importantly, does not entail federal approval of any specific project or confine the discretion of local governments as to the purposes for which the funds should be spent.

There are other substantial reasons which warrant the conclusion that Congress did not intend NEPA to apply to revenue sharing. The Revenue Sharing Act was enacted *after* NEPA was in effect and it is virtually inconceivable that

if Congress had intended compliance with NEPA, it would not have so indicated in the Act. This is particularly true in light of its inclusion of other federal laws in the Act. It cannot be questioned that environmental considerations were much on the minds of legislators at the time of the revenue sharing bill's enactment. Moreover, it cannot be doubted that the applicability of NEPA to revenue sharing would have imposed such added responsibilities on the Secretary in administering revenue sharing that it likely would have been mentioned in the Act. Finally, the legislative history of NEPA indicates that Congress did not contemplate NEPA's applicability to unrestricted block grants of federal funds to states in which there was no continuing federal role in the expenditure of the funds at the local level. See 1972 Duke L.J. at 668. Therefore, it is concluded that the clear intent of the language of the Revenue Sharing Act and its legislative history also warrants dismissal of this suit. ·

*Carolina Action v. Simon,* 389 F.Supp. 1244, 1248–1249 (M.D.N.C.1975) (footnotes omitted).

This decision was released over three years ago and the Fourth Circuit's affirmance and specific adoption of the district court's opinion was made almost three years ago. In the time since this decision, Congress has not overridden this interpretation of the Revenue Sharing Act. Although this is certainly not dispositive of congressional intention, I feel that such inaction in the face of this opinion is instructive. *See* Note, *Environmental Law—NEPA Held Inapplicable to the Revenue Sharing Act,* 51 Tulane L.Rev. 156, 162 (1976);[20] *Alabama Association of Insurance Agents v. Board of Governors of the Federal Reserve System,*

---

**20.** This student commentator states:

The Revenue Sharing Act expires on December 31, 1976. If Congress is to continue revenue sharing beyond that date, it can clarify the issue of NEPA applicability by specifically endorsing or precluding the application of NEPA to the use of revenue sharing funds. Congressional failure to address the issue will probably be interpreted as agreement with the noted decision.[41]

[41] Reenactment of a statute without change in language may be equivalent to legislative sanction of a prior executive or administrative construction of the statute, especially where reenactment is coupled with an express refusal to adopt a provision which would alter the prior construction. *See, e. g., Helvering v. R. J. Reynolds Tobacco Co.,* 306 U.S. 110 [59 S.Ct. 423, 83 L.Ed. 536] (1939); *Poe v. Seaborn,* 282 U.S. 101 [51 S.Ct. 58, 75 L.Ed. 239] (1930).

533 F.2d 224, 239, 245 (5 Cir. 1976), *on rehearing*, 558 F.2d 729 (5 Cir. 1977), *cert. denied*, 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978). To my mind, this is but one of a number of cumulative factors that support my conclusion that only the acts mentioned in the body of the Revenue Sharing Act itself were intended to apply to the Act. Of course, the plaintiff argues that the URA is more specific in its statutory language than NEPA and that it is possible that the URA could apply while NEPA does not.[21] While it is obvious that the statutory language of URA and NEPA is different, I would find it incongruous to distinguish between the two acts. Furthermore, I have quoted from the opinion in *Carolina Action* at length to demonstrate that the opinion is written in a broad language whose reasoning excludes both NEPA and the URA. It is not merely the holding of *Carolina Action* that has been adopted by congressional inaction, it is the interpretative scheme as well.

---

21. In her complaint, the plaintiff argues that both laws apply to revenue sharing funds. The plaintiff, however, agrees that her NEPA claim is moot by virtue of the completion of the Dempsey Avenue project.