Joyce GOOLSBY, Individually and on behalf of all others similarly situated, Plaintiffs-Appellants,

v.

W. Michael BLUMENTHAL, as Secretary of the Department of the Treasury, et al., Defendants-Appellees.

No. 76–2198.

United States Court of Appeals, Fifth Circuit.

Oct. 4, 1978.

Rehearing En Banc Granted Nov. 7, 1978.

Brown, Chief Judge, concurred with statement.

Thornberry, Circuit Judge, dissented and filed opinion.

Steven F. Granberg, Georgia Legal Services Programs, Gerald R. Tarutis, Emerson R. Marks, Jr., Alfred O. Bragg, III, Macon, Ga., James A. Kushner, Los Angeles, Cal., Jack Greenberg, Charles E. Williams, III, New York City, for plaintiffs-appellants.

Denver L. Rampey, Jr., U. S. Atty., Greg J. Leonard, John D. Carey, Asst. U. S. Attys., Macon, Ga., for Simon, Hill, Coleman, et al.

F. Robert Raley, Andrew W. McKenna, City Atty., Macon, Ga., for Ronnie Thompson, et al.

Before Chief Judge BROWN, THORNBERRY and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

Joyce Goolsby, having been told she must leave her apartment to make way for a road construction project, filed this suit in the Middle District of Georgia seeking relocation assistance under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (URA), 42 U.S.C. § 4601 et seq.; seeking a preliminary injunction pending compliance with the requirements of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 et seq.; and seeking relief for various constitutional violations. Originally filed as a class action, the complaint named as defendants the Secretary of the Department of the Treasury; the Secretary of the Department of Housing and Urban Development; the Secretary of the Department of Transportation; the Administrator of the Federal Highway Administration; the Commissioner of the Georgia State Department of Transportation; the Mayor of Macon, Georgia; the members of the City Council of Macon, Georgia; and the Director of the Department of Community Development of Macon, Georgia. Following denial of class certification, all parties filed motions for summary judgment. The trial court, concluding that URA and NEPA did not apply to the construction project which is the subject of this dispute, and concluding further that there were no constitutional violations, granted defendants' motions for summary judgment.

The material facts are not disputed. Ms. Goolsby and her family rented an apartment in the Unionville neighborhood of Macon, Georgia. By March, 1975, the property on which they resided had been acquired by the city of Macon for the purpose of widening, straightening, and paving a .52 mile stretch of Dempsey Avenue. The funds for the project came from two sources: $259,000 from the Georgia Department of Transportation, and $280,000 from general revenue sharing funds allocated to Macon, pursuant to the State and Local Fiscal Assistance Act of 1972 (Revenue Sharing Act), 31 U.S.C. § 1221 et seq. The purchase of land by the city required the displacement of one individual and four families living in their own homes, and five individuals and fourteen families living in rental housing. This suit was filed on April 24, 1975, after Ms. Goolsby received notice to vacate.[1] Summary judgment was entered against Ms. Goolsby on March 1, 1976, and this appeal followed.

Ms. Goolsby originally raised three issues: (1) whether projects funded in part with revenue sharing funds are subject to the requirements of URA; (2) whether projects funded in part with revenue sharing funds are subject to the requirements of NEPA; (3) if either URA or NEPA or both are not made applicable by the use of revenue sharing funds, whether the use of Community Development funds alters the result. The parties have stipulated that all issues involving the applicability of NEPA have become moot because the project has been completed; therefore, we need only address the first question.

The Uniform Relocation Assistance and Real Property Acquisition Policies Act was passed as a remedial measure to lessen the impact of public projects on those persons forced to leave their homes to make way for such projects. 42 U.S.C.A. § 4621 (1977). To achieve this purpose, it was provided that the head of any federal agency

---

[1]. Although administrative remedies are provided under URA, 42 U.S.C.A. § 4633(b)(3) (1977); 24 C.F.R. § 42.60, no contention has been made that the case ought to be dismissed for failure to exhaust those remedies. Indeed, because all of the agencies to which Ms. Goolsby could apply have consistently taken the position that she is not entitled to any relief, there is no reason for us to require her to pursue what would only be futile claims. See Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968).

which undertakes a program or project resulting in the displacement of any person shall make payments for "actual reasonable moving expenses," 42 U.S.C.A. § 4622(a)(1), "actual direct losses of tangible personal property," § 4622(a)(2), and "actual reasonable expenses in searching for a replacement business or farm," § 4622(a)(3). Section 4625 requires the agency involved to provide various other relocation assistance services.[2] Although the provisions of § 4622 and § 4625 refer only to federal agencies, § 4630 conditions the availability of federal funds to state agencies upon the receipt of assurances that the state agencies will comply with the substantive requirements of URA.[3] This limitation upon the disbursement of funds to the states is phrased in very forceful terms, being applicable "notwithstanding any other law."

The problem confronting us is whether the benefits just described ought to be made available to Ms. Goolsby. Relying on the express terms of URA, plaintiff contends that she is entitled to those benefits

---

2. 42 U.S.C.A. § 4625 provides:

(a) Whenever the acquisition of real property for a program or project undertaken by a Federal agency in any State will result in the displacement of any person on or after January 2, 1971, the head of such agency shall provide a relocation assistance advisory program for displaced persons which shall offer the services described in subsection (c) of this section. If such agency head determines that any person occupying property immediately adjacent to the real property acquired is caused substantial economic injury because of the acquisition, he may offer such person relocation advisory services under such program.

(b) Federal agencies administering programs which may be of assistance to displaced persons covered by this chapter shall cooperate to the maximum extent feasible with the Federal or State agency causing the displacement to assure that such displaced persons receive the maximum assistance available to them.

(c) Each relocation assistance advisory program required by subsection (a) of this section shall include such measures, facilities, or services as may be necessary or appropriate in order to—

(1) determine the need, if any, of displaced persons, for relocation assistance;

(2) provide current and continuing information on the availability, prices, and rentals, of comparable decent, safe, and sanitary sales and rental housing, and of comparable commercial properties and locations for displaced businesses;

(3) assure that, within a reasonable period of time, prior to displacement there will be available in areas not generally less desirable in regard to public utilities and public and commercial facilities and at rents or prices within the financial means of the families and individuals displaced, decent, safe, and sanitary dwellings, as defined by such Federal agency head, equal in number to the number of and available to such displaced persons who require such dwellings and reasonably accessible to their places of employment, except that the head of that Federal agency may prescribe by regulation situations when such assurances may be waived;

(4) assist a displaced person displaced from his business or farm operation in obtaining and becoming established in a suitable replacement location;

(5) supply information concerning Federal and State housing programs, disaster loan programs, and other Federal or State programs offering assistance to displaced persons; and

(6) provide other advisory services to displaced persons in order to minimize hardships to such persons in adjusting to relocation.

(d) The heads of Federal agencies shall coordinate relocation activities with project work, and other planned or proposed governmental actions in the community or nearby areas which may affect the carrying out of relocation assistance programs.

3. 42 U.S.C.A. § 4630 (1977) provides:

Notwithstanding any other law, the head of a Federal agency shall not approve any grant to, or contract or agreement with, a State agency, under which Federal financial assistance will be available to pay all or part of the cost of any program or project which will result in the displacement of any person on or after January 2, 1971, unless he receives satisfactory assurances from such State agency that—

(1) fair and reasonable relocation payments and assistance shall be provided to or for displaced persons, as are required to be provided by a Federal agency under sections 4622, 4623, and 4624 of this title;

(2) relocation assistance programs offering the services described in section 4625 of this title shall be provided to such displaced persons;

(3) within a reasonable period of time prior to displacement, decent, safe, and sanitary replacement dwellings will be available to displaced persons in accordance with section 4625(c)(3) of this title.

because she is a "displaced" person under the Act, having moved from her apartment "as a result of the acquisition of such real property . . . for a program or project undertaken by a Federal agency, or with Federal financial assistance . . ." 42 U.S.C.A. § 4601(6). Thus, if the Dempsey project is a "program or project undertaken . . . with Federal financial assistance," then she and her family are entitled to the benefits enumerated in §§ 4622 and 4625. Slightly more than half of the money used in this project came from Macon's general revenue sharing funds, and, according to plaintiff, the use of these funds constitutes "federal financial assistance" and thus obligates the city of Macon to comply with the URA. The Act defines "federal financial assistance" to include:

a grant, loan, or contribution provided by the United States, except any Federal guarantee or insurance and any annual payment or capital loan to the District of Columbia.

42 U.S.C.A. § 4601(4). Viewed in this light, plaintiff's position certainly has appeal.

Revenue sharing funds would appear to be a "contribution provided by the United States," and "notwithstanding any other law" such contributions cannot be made, absent the proper assurances, to pay for all or part of a project that results in displacing any persons.

Defendants, in an attempt to overcome the strong statutory language, point to the legislative history of the Revenue Sharing Act and argue that the intent of Congress, when it passed the Act, was to establish a "no strings attached" method of providing funds to the states. According to defendant, this "no strings" approach was designed to provide federal financial aid to the states, but to avoid the various limitations and restrictions, such as URA, normally accompanying such funds. Defendants find further support for their argument in a "Statement of Congressional Intent" published by several congressmen after the enactment of URA,[4] and a statement made in a speech by the Director of the Office of Revenue Sharing.[5] Finally, directing our

4. The statement as quoted in appellee's brief reads as follows:

We have been informed that the Civil Service Commission is intending to apply the Hatch Act to state and local government employees who are paid in whole or in part from revenue sharing funds. This is completely contrary to what we believe was the clearly expressed Congressional intent that revenue sharing was to be an entirely new concept in federal fiscal programs to which the old rules for federal grants would not apply.

Revenue sharing was intended as a way of assisting state and local governments in their fiscal problems in a manner that would avoid the complexity and restrictions of the previous federal grant programs. Consequently, Congress carefully considered the extent to which federal rules and regulations or 'strings' should be attached to the use of revenue sharing funds. Insofar as state and local governments are concerned, the act names nine specific priority categories for which the funds are to be spent. In addition, two federal laws were specifically made applicable. Congress specifically included anti-discrimination provisions and Davis-Bacon provisions with the understanding that those were the *only* federal laws to apply. The fact that it was believed necessary to include these restrictions for them to have application shows clearly that it was not intended to

make other federal acts, such as the Hatch Act, applicable.

At no time was it the understanding or intent of Congress that any other federal law would apply to the state and local government use of revenue sharing funds. This was one of the major innovative steps taken by the Congress in establishing the revenue sharing program; that funds would be automatically distributed to state and local governments and treated for the most part as state and local government funds. Minimal restrictions on the use of these funds were to be imposed and those referred to above were to be only the ones specified in the State and Local Fiscal Assistance Act.

Consequently, the interpretation by the Civil Service Commission that the Hatch Act is to apply to state and local employees who are paid in whole or in part from federal revenue sharing funds is without foundation in law and is in direct contravention to the clearly expressed intent of Congress.

5. The non-federal appellees quote a statement purportedly made by Graham W. Watt, in a speech to the United States Conference of Mayors Workshop:

Generally speaking, we take the position that only those federal laws specifically referenced in the State and Local Assistance Act of 1972 apply to use of revenue sharing funds.

attention to sections expressly making the Davis-Bacon Act, 40 U.S.C.A. § 276a *et seq.*, and Title VI of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000d, applicable to revenue sharing projects, defendants urge that the express inclusion of these restrictions allows us to infer an intention to exclude all other federal restrictions.

Although defendants' arguments are not without force, we cannot accept their interpretation. First, as we read the legislative history, we agree that it expresses an intention to eliminate, or severely limit, federal involvement in the initial determination of the manner in which the funds are to be used: [6]

> The committee believes the basic purpose of the bill should be to provide the States and localities with a specified portion of

Federal individual income tax collections to be used by them in accordance with local needs and priorities and without the attachment of strings by the Federal Government. . . .

> If 'no strings are attached,' the funds may be spent by the local government for what the local citizenry recognize as their high-priority purposes, rather than having priorities established by the Federal Government for them which could conflict with their own interests.

S.Rep. No. 92–1050, 92nd Cong., 2nd Sess., *reprinted in* 1972 U.S.Code Cong. and Admin.News, pp. 3874, 3876. We do not, however, find any indication of a desire to eliminate all obligations arising as a result of the ultimate manner in which the funds are used.[7] On this question, the legislative

---

Appellee's brief at p. 18.

**6.** The original Act created a very broad list of priorities for which the funds were to be used:

§ 1222(a) Use of funds by local governments for priority expenditures

(a) Funds received by units of local government under this subchapter may be used only for priority expenditures. For purposes of this chapter, the term 'priority expenditures' means only—

 (1) ordinary and necessary maintenance and operating expenses for—

 (A) public safety (including law enforcement, fire protection, and building code enforcement),

 (B) environmental protection (including sewage disposal, sanitation, and pollution abatement),

 (C) public transportation (including transit systems and streets and roads),

 (D) health,

 (E) recreation,

 (F) libraries,

 (G) social services for the poor or aged, and

 (H) financial administration; and

 (2) ordinary and necessary capital expenditures authorized by law.

31 U.S.C.A. § 1222(a). *Mathews v. Massell*, 356 F.Supp. 291 (N.D.Ga.1973). These priorities were repealed by Pub.L. No. 94–488, 90 Stat. 2341 (1976).

**7.** The "no strings" approach to funding was distinguished from existing methods:

Present aid programs generally are of the categorical type and often do not provide for the most pressing purposes. Instead, they provide air for specific and frequently relatively narrowly defined purposes. Moreover, they often require local matching funds

which, in many instances, imposes a financial strain on the local governments and causes a shift of local funds to areas of lesser priority to the local governments. While State and local governments, under certain Federal programs, may retain some flexibility in spending such categorical aid, there are ordinarily severe limitations to this flexibility. . . .

The committee believes that the State and local governments will be able to make most efficient use of the aid funds if they are given the authority to determine how these funds are to be used. To a considerable extent, the adoption of the revenue-sharing program stems from the need to avoid the problems inherent in many categorical programs which specify how the recipient governmental unit is to spend the funds. Such categorical aid programs may result in forcing the recipient governmental unit to spend the funds for the specified purpose even though the governmental unit may have other more urgent needs to finance.

The committee's bill is designed to provide a new program of Federal aid to the States and local governments which will not be subject to the same type of limitations as the categorical aid programs and which will permit these government units flexibility to use the funds most advantageously in the public interest. In other words, the broad purpose of this legislation is to fill the gap in the present aid programs by granting State and local governments complete flexibility in the expenditure of the new aid funds so as to supplement the present categorical aid and to secure a more balanced and efficient system of Federal aid.

1972 U.S.Code Cong. and Admin.News, pp. 3884, 3888–89.

**460**

history is at best inconclusive, offering little or no support for either position. However, one theme is consistent throughout. Revenue sharing, although obviously designed to allow maximum flexibility, is nevertheless perceived as "federal aid," and, as such, ought not to be free from all federal policies and restrictions. Therefore, any weight we attach to the relevant legislative history favors plaintiff's position.

 Defendants' other authorities are similarly unpersuasive. The "Statement of Congressional Intent" is not part of the legislative record and cannot be considered when determining congressional intent. As the Supreme Court has stated:

> post-passage remarks of legislators, however explicit, cannot serve to change the legislative intent of Congress expressed before the Act's passage. . . . Such statements "represent only the personal views of these legislators, since the statements were made after passage of the Act."

*Regional Rail Reorganization Act Cases*, 419 U.S. 102, 132, 95 S.Ct. 335, 353, 42 L.Ed.2d 320, 347 (1974). Similarly, the remarks of Mr. Watt, then Director of the Office of Revenue Sharing, are not entitled to the deference normally afforded agency interpretations. Such informal remarks are a much less reliable indicator of official agency positions than are interpretations contained in the regulations or offered in a formal setting. *Investment Company Institute v. Camp*, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971). Furthermore, even if Mr. Watt's informal remarks on the Revenue Sharing Act are entitled to some deference, his views as to the coverage of other statutes are not those of the agency charged with implementing those other statutes, and, accordingly, are not entitled to the same deference.

Defendants' finally point to the express inclusion of the Davis-Bacon Act, 40 U.S.C.A. § 276a *et seq.* (1969), and Title VI of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000d (1974). Urging application of the

canon of statutory construction *expressio unius est exclusio alterius*, defendants contend that the clear implication is one of excluding all federal statutes not expressly made applicable. Congressional treatment of Title VI is not particularly instructive. As plaintiff points out, Title VI, as mentioned in the 1972 Revenue Sharing Act, contains a significant alteration; sex discrimination has been added to the list of prohibited acts. 31 U.S.C.A. § 1242 (1976). Thus, arguably, the purpose of its mention is to alter its applicability rather than to extend the coverage of Title VI to a statute to which it might not otherwise apply.

The treatment of the Davis-Bacon Act is more useful. In the final version of the Revenue Sharing Act, Davis-Bacon was made applicable only to projects in which revenue sharing funds amounted to 25% or more of the total. 31 U.S.C.A. § 1243(a)(6) (1976). Plaintiff would have us treat this limitation in the same manner as the alteration of Title VI mentioned above; however, the legislative history reveals a much more significant interpretation. The original House version of the Revenue Sharing Act would have made Davis-Bacon fully applicable to all projects funded in whole or in part with revenue sharing funds. 1972 U.S. Code Cong. and Admin.News, pp. 3889–90. The Senate Finance Committee deleted this provision stating: "it is no more appropriate to specify the wage rates that are to be paid with aid funds in such cases than to specify how the local governments are to spend the funds." *Id.* at 3890. From the Senate discussion, it is possible to infer a feeling by the Senators that Davis-Bacon would not apply unless expressly made applicable. Thus the 25% limitation on Davis-Bacon is seen as a compromise rather than an inclusion for the purpose of altering the scope of an act which would have applied without being mentioned. Because Davis-Bacon is an act of general applicability, covering "public works . . . financed in whole or part by loans or grants from the United States . . .,"[8] 40 U.S.C.A.

---

**8.** It is interesting to note that Davis-Bacon applies to projects receiving loans or grants from

the federal government, whereas URA applies to projects receiving loans, grants, or *contribu-*

§ 276c (1969), its treatment provides an interesting analogy to the issue at hand. If the treatment of Davis-Bacon is read to indicate the feeling that federal requirements not mentioned in the Revenue Sharing Act are not applicable, that inference certainly supports the position taken by the defendants. However, one additional factor must be considered.

■■■ In effect, defendants' position, and that of the court below, is that the Revenue Sharing Act is impliedly exempted from URA. This contention is contrary to the strong policy against such implied exemptions. *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974); *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). In order to hold that one statute has created an implied exemption from another statute, we must conclude that there is either an "affirmative showing of the intent to repeal" or a "positive repugnancy which 'cannot be reconciled.'" *ICC v. Southern Railway Co.,* 543 F.2d 534 (5th Cir. 1976). Where the two statutes in question are capable of standing together, there is no irreconcilable conflict.

Considering the statutes before us, we are not persuaded that they are incapable of standing together. Neither the ends hoped to be achieved nor the means chosen appear to conflict irreconcilably. The Revenue Sharing Act requires that certain assurances be given before a recipient becomes entitled to its portion of the revenue sharing funds.[9] Similarly, URA prohibits

---

tions from the federal government. An argument could be made that the inclusion of federal contributions in URA extends the applicability of URA beyond that of Davis-Bacon, thus making it necessary to specifically mention Davis-Bacon in order to insure its applicability, but not necessary to mention URA.

9. 31 U.S.C.A. § 1243 provides:

(a) In order to qualify for any payment under subchapter I of this chapter for any entitlement period beginning on or after January 1, 1973, a State government or unit of local government must establish (in accordance with regulations prescribed by the Secretary, and, with respect to a unit of local government, after an opportunity for review and comment by the Governor of the State in which such unit is located) to the satisfaction of the Secretary that—

(1) it will establish a trust fund in which it will deposit all payments it receives under subchapter I of this chapter;

(2) it will use amount in such trust fund (including any interest earned thereon while in such trust fund) during such reasonable period or periods as may be provided in such regulations;

(3) Repealed.

(4) it will provide for the expenditure of amounts received under subchapter I of this chapter only in accordance with the laws and procedures applicable to the expenditure of its own revenues;

(5) it will—

(A) use fiscal, accounting, and audit procedures which conform to guidelines established therefor by the Secretary (after consultation with the Comptroller General of the United States),

(B) provide to the Secretary (and to the Comptroller General of the United States), on reasonable notice, access to, and the right to examine, such books, documents, papers, or records as the Secretary may reasonably require for purposes of reviewing compliance with this chapter (or, in the case of the Comptroller General, as the Comptroller General may reasonably require for purposes of reviewing compliance and operations under subsection (c)(2) of this section), and

(C) make such annual and interim reports (other than reports required by section 1241 of this title) to the Secretary as he may reasonably require;

(6) all laborers and mechanics employed by contractors of subcontractors in the performance of work on any construction project, 25 percent or more of the costs of which project are paid out of its trust fund established under paragraph (1), will be paid wages at rates not less than those prevailing on similar construction in the locality as determined by the Secretary of Labor in accordance with the Davis-Bacon Act, as amended, and that with respect to the labor standards specified in this paragraph the Secretary of Labor shall act in accordance with Reorganization Plan Numbered 14 of 1950 and section 276c of Title 40;

(7) individuals employed by it whose wages are paid in whole or in part out of its trust fund established under paragraph (1) will be paid wages which are not lower than the prevailing rates of pay for persons employed in similar public occupations by the same employer; and

final approval of federal financial assistance by the head of the relevant agency until the recipients have given assurances that the terms of URA will be followed if a project results in the displacement of any individual.[10] We perceive no reason why these assurances cannot be given simultaneously, or in any other manner designed to convince the Secretary of the Treasury that persons displaced by revenue sharing projects will be relocated. The mechanical implementation of the programs required by URA would certainly pose no more problems when arising in the context of a revenue sharing project than when arising in the context of any other state program receiving federal aid. Finally, we are not unaware of the possibility that the increase in costs by an amount sufficient to cover relocation expenses might negatively influence the decision to proceed with a particular project. However, we feel the risk that such increased costs will deter recipients of revenue sharing funds from undertaking projects is insignificant when balanced against the strong federal policies designed to ensure adequate housing and an equitable distribution of the burdens arising out of public works programs. The importance of these policies has been clearly stated by Congress:

> [I]t [has become] increasingly apparent that the application of traditional concepts of valuation and eminent domain resulted in inequitable treatment for large numbers of people displaced by public action. When applied to densely populated urban areas, with already limited housing, the result can be catastrophic for those whose homes or businesses must give way to public needs. The result far too often has been that a few citizens have been called upon to bear the burden of meeting public needs. . . . The imperative need for a uniform, fair, and comprehensive program in this area

has been . . . documented . . . The bill as recommended is necessary to eliminate the great inconsistencies that exist among Federal and federally assisted programs with respect to the amount and scope of payments, other assistance provided, and assurance of housing offered. It recognizes that relocation is a serious and growing problem in the United States and that the pace of displacement will accelerate in the years immediately ahead. It recognizes that advisory assistance is of special importance in the relocation process especially for the poor, the nonwhite, the elderly, and people engaged in small business. . . . In short, this legislation recognizes that the Federal Government has a primary responsibility to provide uniform treatment for those forced to relocate by Federal and federally aided public improvement programs and to ease the impact of such forced moves.

H.R.Rep. 91–1656, 91st Cong., 2nd Sess., *reprinted in* 1970 U.S.Code Cong. and Admin.News, pp. 5851–52.

To resolve the question confronting us, we must balance the inference of exclusionary intent against the recognized judicial opposition to implied exemptions, the clearly enunciated congressional policies which prompted URA, and the forceful language contained in the provisions making URA applicable to the states. Although defendants' arguments that URA does not apply to revenue sharing projects are not totally without merit, they fall short of establishing an affirmative intent to repeal URA, or an irreconcilable conflict between URA and the Revenue Sharing Act. After reviewing the express terms of the acts in question, the structure of the acts, and the relevant legislative and administrative materials, we cannot conclude that the Revenue Sharing Act created an implied exemption from

---

(8) in the case of a unit of local government as defined in the second sentence of section 1227(d)(1) of this title (relating to governments of Indian tribes and Alaskan native villages), it will expend funds received by it under subchapter I of this chapter for the benefit of members of the tribe or village residing in the county area from the allocation of which funds are allocated to it under section 1227(b)(4) of this title.

**10.** *See* note 3, *supra*.

URA. Where Congress has established the standard that "notwithstanding any other law" states are not entitled to federal contributions absent the requisite relocation assurances we would be most reluctant to rule that such a strong standard could be circumvented as easily as defendants suggest.

■ This result is not inconsistent with the "no strings" approach of the Revenue Sharing Act. It does not hamper in any significant way the flexibility given to the states to use revenue sharing funds in accordance with local priorities, rather than being compelled to use those funds on projects selected by the federal government. Instead, we seek to effectuate the strong policy of the URA by ensuring that revenue sharing funds are not used to place a disproportionate burden for projects designed to benefit the public as a whole upon those unfortunate few who are forced to leave their homes. If Congress intended, by enacting the Revenue Sharing Act, to allow the states to avoid obligations such as those imposed by URA, it did not express that intention in a meaningful and discernible manner. Until such time as the intent to remove such requirements is more clearly expressed, we are compelled to hold that no implied exemption was intended, and that URA is applicable to projects where the only federal involvement is the presence of revenue sharing funds. We hold that Joyce Goolsby is entitled to relocation benefits, and that the judgment below, insofar as it

applies to officials responsible for providing relocation assistance in connection with the Dempsey Avenue project, must be reversed. Under the terms of URA, the Mayor and City Council of Macon, Georgia, the officials in charge of the Dempsey project, are required to provide whatever assistance is due Ms. Goolsby. 42 U.S.C.A. § 4630; cf. 24 C.F.R. § 42.20(s), § 42.65. As to the other defendants, they are not responsible for providing relocation benefits in this case.[11] Accordingly, the judgment below on this issue is affirmed as to all federal and state defendants, and reversed as to all local defendants.

AFFIRMED in part, and REVERSED in part.

JOHN R. BROWN, Chief Judge, concurring:

I concur in the result and in the reasoning of the opinion. I cannot, however, refrain from pointing out that, paraphrasing the now famous quip of Judge Henry Friendly of the Second Circuit, our problem is to determine what Congress would think on an issue about which it has not thought.[1] We offer an extension to fit this case: had Congress thought, it would have told us what it thought.

To those who think that the judiciary is too quick to become too deeply involved in legislative solutions to the day's problems, and who believe that courts should show a

---

11. Although our decision requires that local money be used to provide the URA benefits, we believe that future displacements need not be funded solely by local government. URA provides that money spent to provide the required benefits will be federal money to be added to the other costs of a project and included in the federal dollars received by the state or local agency. 42 U.S.C.A. § 4631. Only where a state or local agency has violated URA, failed to request funds sufficient to provide the URA benefits, expended all of the provided federal money, and is unable to obtain other federal assistance to help pay URA costs will the agency be required to use non-federal money. Therefore, in the future, local units complying with URA can apply for extra federal funds to cover the cost of displacements.

Any administrative difficulties springing from our holding have been greatly ameliorated

by 1976 amendments to 31 U.S.C.A. § 1241. The recent enactments impose reporting and accounting requirements on the use of revenue sharing funds. As a result, there should be little difficulty in determining whether revenue sharing is involved in a particular project for purposes of applying URA.

1. See *Nolan v. Transocean Air Lines*, 2 Cir., 1960, 276 F.2d 280, 281, rev'd, 365 U.S. 293, 81 S.Ct. 555, 5 L.Ed.2d 571, on remand, 2 Cir., 290 F.2d 904. Those of us who have borrowed this idea in the past hope that we have given a sufficient acknowledgment. See *Wirth Ltd. v. S/S Acadia Forest*, 5 Cir., 1976, 537 F.2d 1272, 1276; *Hopkins v. Lockheed Aircraft Corp.*, 5 Cir., 1968, 394 F.2d 656, 657; *Page v. St. Louis Southwestern Ry. Co.*, 5 Cir., 1965, 349 F.2d 820, 823.

greater restraint or, to adopt a moralistic tone, a "decent respect" for other decision-making bodies, this case is Exhibit A for a different view of how responsibility is divided. This exhibit supports the strongly held suspicion that too often the legislative view is: if our work is deficient, the courts will patch it up.

If our juryrig[2] patchwork efforts are deficient, the fault does not lie at our feet.

THORNBERRY, Circuit Judge, Dissenting:

Judge Morgan's opinion for the majority reflects careful and serious scholarship. I must, however, respectfully dissent.

One need read only six lines of the legislative history of the State and Local Assistance Act of 1972 (Revenue Sharing Act)[1] to see the phrase "no strings."[2] Although I have no desire to exult the phrase "no strings" into a needless shibboleth distinguishing as did Jephthah between the impermissible strings of the Ephraimites and the permissible strings of the Gileadites,[3] I think the phrase is a useful description of the purpose of the Revenue Sharing Act. Since I believe that the Revenue Sharing Act is such a radical departure from the funding measures traditionally used by the federal government, I think there is an irreconcilable conflict between the demands of the Uniform Relocation Assistance and

Real Property Acquisition Policies Act of 1970 (URA)[4] and the program contemplated by revenue sharing. Furthermore, I conclude that the policy of both the URA and the Revenue Sharing Act cannot both be advanced without diminishing the force of the Revenue Sharing Act. Finally, I think that Congress intended that the Revenue Sharing Act be free from the encumbrances such as the URA historically associated with block grants.

In my conclusion that the URA does not apply to revenue sharing funds, I rely on three arguments. First, the institutional function and administration of the URA is so far afield from the program contemplated by Congress for revenue sharing as to make the teeth of the URA not fit into the gear of revenue sharing. Second, although as Chief Judge Brown has succinctly noted, the legislative history of the Act is not completely clear, I think that the history of the Act is such as to justify the conclusion that Congress intended the Revenue Sharing Act to float on its own bottom and not be encumbered by the sargasso of some foreign sea. Last, I think that Congress by failing to override a parallel decision of a sister circuit regarding the applicability of the National Environmental Policy Act of 1969 (NEPA)[5] to revenue sharing funds has adopted the rationale of *Carolina Action v. Simon*[6] that only the acts specifically mentioned in the body of the Revenue Sharing

---

2. See *Little v. Green*, 5 Cir., 1970, 428 F.2d 1061, 1067. In this case the "jury" is not the court's factfinder. Rather, it is the ship's rudder, without which she is helpless.

1. 31 U.S.C. § 1221 *et seq.*

2. S.Rep.No. 92–1050, 92d Cong., 2d Sess., reprinted in 1972 U.S.Code Cong. and Admin. News, p. 3874.

 Of course, the phrase no strings can be read in a narrow manner. For such a reading see Kushner and Werner, *Revenue Sharing and Relocation: The Administrative Dilemma of Ostensibly Conflicting Congressional Directives*, 5 Ecology L.Q. 433, 438–442. Interestingly, the plaintiff's brief in this case is an edited version of this law review article.

3. Appropriately, I have borrowed from Judges 12:4–6.

 4. Then Jephthah gathered together all the men of Gilead, and fought with Ephraim:

and the men of Gilead smote Ephraim, because they said, Ye Gileadites are fugitives of Ephraim among the Ephraimites, and among the Manassites.

5. And the Gileadites took the passages of Jordan before the Ephraimites: and it was so, that when those Ephraimites which were escaped said, Let me go over; that the men of Gilead said unto him, Art thou an Ephraimite? If he said, Nay;

6. Then said they unto him, Say now Shibboleth: and he said Sibboleth: for he could not frame to pronounce it right. Then they took him, and slew him at the passages of Jordan: and there fell at that time of the Ephraimites forty and two thousand.

4. 42 U.S.C. § 4601 *et seq.*

5. 42 U.S.C. § 4321 *et seq.*

6. 389 F.Supp. 1244 (M.D.N.C.), *aff'd per curiam*, 522 F.2d 295 (4 Cir. 1975).

Act are applicable to the revenue sharing program.

## I.

## THE CONFLICTING POLICIES OF THE TWO ACTS.

The majority notes that "[t]he mechanical implementation of the programs required by the URA would certainly pose no more problems when arising in the context of a revenue sharing project than when arising in the context of any other state program receiving federal aid." Slip Opinion at 53. I do not share the majority's optimism. I think that revenue sharing and block grants are vastly different programs and the majority does not fully appreciate the difficulties associated with the tandem administration and implementation of the two Acts. To demonstrate my point, briefly, I wish to note the disparate funding and review mechanism contemplated by the URA and by revenue sharing. Furthermore, I wish to predict the problems that will arise in the enforcement of today's decision.

Under the Revenue Sharing Act, payments are automatically made once the proper assurances under Section 1243(a) of the Act are received. These assurances are minimal. The recipients must submit a report on the planned use of revenue sharing funds.[7] This is a very short and non-detailed report, and the recipients must give assurances that they will use the accepted accounting procedure[8] and will spend the revenue sharing money in compliance with the Act.[9] Furthermore, the Act contains only three express prohibitions. First, revenue sharing funds cannot be used to match federal funds under another federal program.[10] Second, the recipients must follow the anti-discrimination provision specifically contained in the Act.[11] Last, the recipients must follow the modified version of the

Davis-Bacon Act also contained in the body of the Act.[12]

On the other hand, Section 4630 of the URA declares that "[t]he head of a Federal agency shall not approve any grant . . . unless he receives satisfactory assurances from such State agency that—[the URA will be followed]." This contemplates discretionary federal approval and specific requests to fund specific projects. The Revenue Sharing Act imposes no such federal review. I am at a loss to understand how these two Acts can work in consort if one Act provides for automatic distribution and the other Act contemplates prior federal approval for specifically proposed projects. The distinguishing feature between the two Acts is that the URA envisions federal control over a funded project while revenue sharing does not. The Fourth Circuit correctly noted this in *Ely v. Velde*, 497 F.2d 252, 256 (4 Cir. 1974), when it declared, "A block grant is not the same as unencumbered revenue sharing, for the grant comes with strings attached."

Additionally, I see vast administrative problems in determining when a project is funded with revenue sharing money. Once revenue sharing money is distributed to local governments it is very difficult to determine how the money is actually spent. *See* Note, *The Revenue Sharing Act of 1972: Untied and Untraceable Dollars from Washington*, 10 Harv.J.Legis. 276 (1973). Certainly, there is the possibility of localities co-mingling federal and local funds, *see* 47 Notre Dame Lawyer 1042, 1056 (1972), and there is the possibility that revenue sharing funds would be diverted to projects that would not result in displacement thereby freeing purely local money for displacement projects. *See* Note, *The Application of Federal Environmental Standards to the General Revenue Sharing Program: NEPA and Unrestricted Federal Grants*, 60 Va.L. Rev. 114, 133 (1974).

---

**7.** 31 U.S.C. § 1241(b).

**8.** 31 U.S.C. § 1243(a)(5)(A).

**9.** 31 U.S.C. § 1243(a)(3).

**10.** 31 U.S.C. § 1223.

**11.** 31 U.S.C. § 1242.

**12.** 31 U.S.C. § 1243(a)(6). Local recipients must also honor the priority expenditures of 31 U.S.C. § 1222(a). There is no similar requirement for state governments.

Of course, the fact that there are administrative difficulties in the enforcement of a law is certainly no reason to ignore the law.[13] However, I wish to point out a more significant factor regarding the difficulty of enforcement. Congress is fully cognizant of these enforcement problems[14] and yet does nothing about them. To me, it is incredible that Congress would not move against the enforcement problems unless the Congress thinks that there is no need—i. e., there is no enforcement problem regarding other laws because no other law affects revenue sharing.

## II.

## LEGISLATIVE HISTORY.

I believe that there are three useful arguments that can be made regarding the legislative history of the Revenue Sharing Act. All three arguments point to the proposition that the Act was meant to exclude the applications of acts not specifically mentioned in the body of the Revenue Sharing Act. First, there is the disagreement between the House and the Senate regarding the scope of any supposed strings on revenue sharing money. I think that this debate and disagreement between the two views of revenue sharing demonstrate that all agreed as to the exclusive nature of revenue sharing but the House and Senate simply disagreed as to the scope of federal attachment contained in the body of the

Act. Even the most insistent member in favor of federal strings—Representative Mills—limited his insistence to encumbrances in the body of the Act itself. Second, I think that congressional debate on the applicability of the Davis-Bacon Act, 40 U.S.C. § 276a et seq., is instructive. Last, I think floor debate—particularly in the Senate—demonstrates that Congress knew that revenue sharing would be limited to the acts specifically mentioned.

A. The House-Senate Compromise Over Strings.

The most ardent supporter of federal control over the revenue sharing process was Representative Wilber Mills, the Chairman of the House Ways and Means Committee. Representative Mills' primary concern was the problem of separating the taxing function from the spending function. He reasoned that revenue sharing might create political bodies with money to spend thanks to revenue sharing but with no appreciation of the tax gathering efforts made by the federal government on their behalf. Pursuant to this view, the House bill imposed certain priority expenditures on the state and local governments. Revenue sharing money could be used for only three areas: safety, environmental protection, and public transportation.[15] Moreover, capital expenditures were limited to sewage collection, refuse disposal systems and public transportation.[16]

13. Of course, courts are vigilant in guarding against sham transactions, see Mathews v. Massell, 356 F.Supp. 291 (N.D.Ga.1973), and Named Individual Members of the San Antonio Conservation Society v. Texas Highway Dept., 446 F.2d 1013, 1028 (5 Cir.), cert. denied, 400 U.S. 968, 91 S.Ct. 368, 27 L.Ed.2d 388 (1971), but I do think that it is important to note that in both of these cases the courts' conclusion that the transactions were sham transactions was made easy by statements by public officials. In the future, the cases will not be so easy. To avoid the possibility of both careful avoidance and outright sham, several commentators have suggested that any local project that results in displacement be presumed to have been financed with federal money. See Kushner and Werner, Note 2, supra, 455–459. Therefore the localities would have the burden of proving that the displacement resulted from exclusively local money.

14. Hearings on Revenue Sharing Before the Subcomm. on Intergovernmental Relations of

the Senate Comm. on Governmental Operations, 93d Cong., 2d Sess., pt. 1, at 424 (1974).

Senator Muskie: Could they also be used to fund programs which could not be funded directly by revenue sharing under the law? Mr. Nathan: . . . You are right. The so called fungibility of public money permits state and local officials to use these financial resources interchangeably, and in doing so, because—and this is a phrase we have highlighted—because all money is green, there are opportunities for them to assign or attribute shared revenue to particular functions among the priority expenditure categories in the act, but not to add expenditures to that category and then to use shared revenue for some other purpose.

15. 118 Cong.Rec. 35,896 (1972).

16. Id.

Even with this view of federal control over revenue sharing, the House Committee report made specific its desire not to oversee local expenditures down to minute detail: [17]

> The basic purpose of the new assistance program is to help State and local governments finance their vital needs. In keeping with this objective, it is essential that the funds, in fact, be spent for high priority purposes. In its consideration of the problem, your committee studied a number of different approaches. On the one hand, it would theoretically have been possible for the legislation to insure that the aid funds are spent for desirable high-priority purposes by setting down minute and detailed specifications as to how the funds are to be spent. Your committee rejected this procedure, however, because it would defeat a major purpose of the new program, namely, to fill in a gap in the present categorical aid programs by providing a more flexible system of assistance.

On the other hand, the Senate, primarily under the leadership of Senator Russell Long, preferred a more liberal version of revenue sharing—one that would not spell out the permissible uses of revenue sharing monies. The Senate version of the revenue sharing bill did not attach any limitation on the use of revenue sharing money nor did the Senate bill create any priority categories.[18]

The Conference Report was a compromise between the two bills. The eventual law retained the priority concept but on a lesser scale than that established by the House bill. However, the Conference Report allowed normal capital expenditures.

The plaintiff suggests that since Representative Mills favored federal "strings" and since his view, albeit modified, eventually became law, the Revenue Sharing Act is merely another federal grant in aid program and Acts such as the URA are fully applicable to revenue sharing monies just as they are applicable to grant in aid programs. To me, this argument is wide of the mark. If there is to be an inference to be made from the House-Senate disagreement, it is not that revenue sharing is merely another grant in aid program; rather, it is that Representative Mills knew that revenue sharing funds would not be affected by any other federal law and he was careful to build into the body of the Act provisions that he thought necessary to protect federal interests. I cannot escape the conclusion that even though the Conference bill was a compromise, the Revenue Sharing Act that survived the House, the Senate, and the Conference Committee was self-contained; that is, any federal controls were embodied within the Act itself.

**B. Davis-Bacon Debate.**

Wisely, the majority does not accept the plaintiff's proffered explanation that the Davis-Bacon Act was included in the Revenue Sharing Act merely to modify its already general application. Not only does this explanation assume the ultimate fact to be proved—that other laws affect revenue sharing—it is erroneous history as well.

The legislative history in regard to the application of the Davis-Bacon Act reveals the following: the House bill, consistent with the House's general view of close federal review of revenue sharing monies, contained a provision that required state and local conformity with the Davis-Bacon Act as a part of revenue sharing. Indeed, if there is any reasonable inference to be made from the House's action, it is that the Davis-Bacon Act would not have applied

---

17. H.R.Rep.No. 92–1018, 92nd Cong., 2d Sess. 11 (1972).

18. S.Rep.No. 92–1050, 92 Cong., 2d Sess., pt. 1, at 3 (1972), 1972 U.S.Code Cong. & Admin. News at p. 3876. The Senate Report explained:
The House bill would have required the funds to be used only for a limited number of so-called high-priority purposes. On the other hand, the committee believes that one of the principal virtues of revenue sharing is the fact that this program is different from the categorical grant programs. If "no strings are attached," the funds may be spent by the local government for what the local citizenry recognize as their high priority purposes, rather than having priorities established by the Federal Government for them which would conflict with their own interests.

absent the specific inclusion of the Act in the Revenue Sharing Act. Similarly, the inference must also be made that the URA does not apply to revenue sharing funds absent specific inclusion.

The Senate Committee, in making its objection clear, rejected the inclusion of the Davis-Bacon Act. However, Senator Vance Hartke introduced a floor amendment requiring the inclusion of the Davis-Bacon Act. 118 Cong.Rec. 29,511, 29,519 (1972). *See* Stolz, *Revenue Sharing—New American Revolution or Trojan Horse?,* 58 Minn. L.Rev. 1, 82–85 (1973). The Conference Committee then allowed a compromise version of the two views to become law. To accept the plaintiff's view is to say that the House acted redundantly by including the Davis-Bacon requirements as a part of the Revenue Sharing Act.

C. The Senate Debate.

I believe that the floor debate, particularly the support given the revenue sharing program by Senator Long, demonstrates that the Senate knew that the use of revenue sharing funds would not trigger the application of other related federal laws and standards. In response to Senator Hartke's amendment to make the provisions of the Labor Standards Act applicable to the 1964 Mass Transportation Act, Senator Long said: [19]

> Mr. President, under the Senator's logic we can take every desirable condition that has been put on aid to education from the kindergarten to a postgraduate degree and say if 1 nickel of revenue-sharing money finds it way into the schools, colleges, or kindergartens, they must comply with all of those conditions. When you put those conditions on, they must pay the cost to comply. Here we say if even 1 nickel of revenue sharing gets into the hospital, for instance, it must comply with all of the conditions of the Hill-Burton Act; if 1 nickel gets into the highway program, all of the conditions of Federal aid to highways must be met. We have standards for the con-

struction of sewers. The county would have to comply with all the Federal standards for the construction of a sanitary system. If they want to put in a day care center, they would have to comply with all the Federal conditions for day care centers. The problem is there are so many conditions that the local governments could not comply with all of them without a tremendous burden, if they were to get even 1 nickel of revenue sharing money.

> Those examples are just as logical as someone's union rights. There is no end to the conditions the minds of men could conceive along this line. If Senators are against the bill, they should vote for the amendment. These are the kinds of things that everybody agrees will kill revenue sharing—or the sort of conditions that local governments would find it difficult to comply with.

I believe the student author of Note, *General Revenue Sharing, NEPA, and the Bureaucratic Paper Shuffle: Must the Federal Government Prepare Environmental Impact Statements Prior to Local Spending Decisions?,* 25 Case W. Res. L. Rev. 797, 824, has accurately described the legislative history of the Revenue Sharing Act:

> In conclusion, while there is no clear evidence that in 1972 Congress specifically analyzed the interrelation of NEPA and revenue sharing, there is ample evidence that Congress considered and rejected as a general proposition the application of any federal standards other than those in the bill. For the courts to elevate NEPA over all other nondiscretionary statutory requirements and hold that it alone applies to the Revenue Sharing Act without express inclusion would infringe on Congress' legislative prerogative.

III.

CONGRESSIONAL FAILURE TO OVERRIDE *CAROLINA ACTION.*

In *Carolina Action v. Simon,* 552 F.2d 295, 296 (4 Cir. 1975), the Fourth Circuit reject-

---

**19.** 118 Cong.Rec. 29,530–31 (1972).

ed the plaintiff's argument that the Secretary of the Treasury was under a duty pursuant to NEPA and the Revenue Sharing Act to submit an environmental impact statement before disbursing revenue sharing funds earmarked by the local recipients for several capital improvements. In holding that NEPA did not apply to a project in which the only federal participation was the distribution of revenue sharing monies, the court specifically adopted the lower court's memorandum opinion. The district court held, *inter alia* :

Finally, an examination of the Revenue Sharing Act and its legislative history provides a final ground for dismissing this lawsuit. There is little dispute that the intent and objective of the Revenue Sharing Act was to return to the states and local communities revenues collected by the federal government so that the state and local governments could spend these funds according to their own perceived demands and objectives and not those of the federal government. This concept has been loosely referred to as a "no [federal] strings" approach to federal assistance as evidenced by pronouncements of the President and legislators involved in the Act's formulation. The Office of Revenue Sharing has so construed the Act as well, announcing that only federal standards set forth in the Act will be applied. 60 Va.L.Rev. at 123 n. 58. The defendants press on the Court the proposition that the fundamental no strings philosophy of this legislation precludes the application of NEPA to revenue sharing projects since the Revenue Sharing Act itself makes no mention of NEPA applicability although NEPA was then in effect.

The plaintiff vigorously contends that the legislative history, while reflecting this "no strings" philosophy in the original perception of the Act, ultimately reveals a decision to place substantial federal controls on revenue sharing funds. They point to the Act itself and the significant federal restrictions imposed on a local community's use of funds.

The Revenue Sharing Act does contemplate federal control at several stages. Sections 1241(b) and (c) request state and local governments to submit a report to the Secretary of the Treasury "setting forth the amounts and purposes for which it plans to spend or obligate the funds which it expects to receive . . ." before obtaining revenue sharing funds. This provision is apparently tied in with the requirements that the funds be used only for priority expenditures, as defined in § 1222(a), that the projects funded be administered so as to ensure nondiscrimination and that the requirements concerning compliance with certain disbursement, auditing and reporting procedures and the fair labor standards of the Davis-Bacon Act be effectuated. 31 U.S.C. § 1243(a), § 1242. Penalties for noncompliance with these above requirements are set forth in the Act and include a 110 per cent repayment penalty for nonpriority expenditures and withholding of payments for other violations. 31 U.S.C. §§ 1243(a)(3), 1243(b). Other provisions provide methods by which the Secretary may monitor or evaluate compliance and thereby enforce the requirements. 31 U.S.C. § 1243(c), § 1241(a).

Despite this impressive array of federal involvement in the Revenue Sharing procedure, the Court is not persuaded that another significant and conspicuous federal act, namely NEPA, should be read into the requirements for disbursement of revenue sharing funds. The requirements enumerated above relate exclusively to compliance with specifically designated priority uses and specifically named laws. The planned use report does not relate to the amount of money to be received and, more importantly, does not entail federal approval of any specific project or confine the discretion of local governments as to the purposes for which the funds should be spent.

There are other substantial reasons which warrant the conclusion that Congress did not intend NEPA to apply to

revenue sharing. The Revenue Sharing Act was enacted *after* NEPA was in effect and it is virtually inconceivable that if Congress had intended compliance with NEPA, it would not have so indicated in the Act. This is particularly true in light of its inclusion of other federal laws in the Act. It cannot be questioned that environmental considerations were much on the minds of legislators at the time of the revenue sharing bill's enactment. Moreover, it cannot be doubted that the applicability of NEPA to revenue sharing would have imposed such added responsibilities on the Secretary in administering revenue sharing that it likely would have been mentioned in the Act. Finally, the legislative history of NEPA indicates that Congress did not contemplate NEPA's applicability to unrestricted block grants of federal funds to states in which there was no continuing federal role in the expenditure of the funds at the local level. See 1972 Duke L.J. at 668. Therefore, it is concluded that the clear intent of the language of the Revenue Sharing Act and its legislative history also warrants dismissal of this suit.

*Carolina Action v. Simon*, 389 F.Supp. 1244, 1248–1249 (M.D.N.C.1975) (footnotes omitted).

This decision was released over three years ago and the Fourth Circuit's affirmance and specific adoption of the district court's opinion was made almost three years ago. In the time since this decision, Congress has not overridden this interpretation of the Revenue Sharing Act. Although this is certainly not dispositive of congressional intention, I feel that such inaction in the face of this opinion is instructive. *See* Note, *Environmental Law—NEPA Held Inapplicable to the Revenue Sharing Act,* 51 Tulane L.Rev. 156, 162 (1976); [20] *Alabama Association of Insurance Agents v. Board of Governors of the Federal Reserve System,* 533 F.2d 224, 239, 245 (5 Cir. 1976), *on rehearing,* 558 F.2d 729 (5 Cir. 1977), *cert. denied,* 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978). To my mind, this is but one of a number of cumulative factors that support my conclusion that only the acts mentioned in the body of the Revenue Sharing Act itself were intended to apply to the Act. Of course, the plaintiff argues that the URA is more specific in its statutory language than NEPA and that it is possible that the URA could apply while NEPA does not.[21] While it is obvious that the statutory language of URA and NEPA is different, I would find it incongruous to distinguish between the two acts. Furthermore, I have quoted from the opinion in *Carolina Action* at length to demonstrate that the opinion is written in a broad language whose reasoning excludes both NEPA and the URA. It is not merely the holding of *Carolina Action* that has been adopted by congressional inaction, it is the interpretative scheme as well.

### IV.

Finally, I am concerned with the disposition of this case. The majority affirms the summary judgment granted to the federal defendants and puts the entire burden on the local defendants. Assuming that the majority is correct about the applicability of the URA, it has misapplied this law.

**20.** This student commentator states:
The Revenue Sharing Act expires on December 31, 1976. If Congress is to continue revenue sharing beyond that date, it can clarify the issue of NEPA applicability by specifically endorsing or precluding the application of NEPA to the use of revenue sharing funds. Congressional failure to address the issue will probably be interpreted as agreement with the noted decision.[41]

[41] Reenactment of a statute without change in language may be equivalent to legislative sanction of a prior executive or administrative construction of the statute, especially where reenactment is coupled with an express refusal to adopt a provision which would alter the prior construction. *See, e. g., Helvering v. R. J. Reynolds Tobacco Co.,* 306 U.S. 110 [59 S.Ct. 423, 83 L.Ed. 536] (1939); *Poe v. Seaborn,* 282 U.S. 101 [51 S.Ct. 58, 75 L.Ed. 239] (1930).

**21.** In her complaint, the plaintiff argues that both laws apply to revenue sharing funds. The plaintiff, however, agrees that her NEPA claim is moot by virtue of the completion of the Dempsey Avenue project.

First, the URA demands that relocation expenses be provided. The majority has the city provide this. But it is also clear that the federal defendants must specifically condition the federal funds on the promise to obey URA. This they have not done. The federal officials have violated the law as much as the local defendants and yet summary judgment is affirmed to them. Furthermore, it is error to have the local defendants bear the cost of the relocation. Today's result simply discounts revenue sharing money. This is not the result contemplated by the URA which the majority specifically holds applicable. Section 4631 of the URA requires that the relocation expenses are to be provided by the federal government as a part of the grant.[22] Today's result has the payment made by the state or city. It is the ultimate irony of today's decision that the city is worse off by its use of "no strings" revenue sharing money than it would have been had it obtained funding through one of the traditional grant in aid programs for the specific completion of the Dempsey Avenue project.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

Before BROWN, Chief Judge, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN and VANCE, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc.

IT IS ORDERED that the cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.

22. § 4631. Federal share of costs

Inclusion of cost to State agency of providing relocation payments and assistance in cost of program or project; eligibility of State agency for Federal financial assistance; amount of assistance

(a) The cost to a State agency of providing payments and assistance pursuant to sections 4626, 4630, 4635, and 4655 of this title, shall be included as part of the cost of a program or project for which Federal financial assistance is available to such State agency, and such State agency shall be eligible for Federal financial assistance with respect to such payments and assistance in the same manner and to the same extent as other program or project costs, except that, notwithstanding any other law in the case where the Federal financial assistance is by grant or contribution the Federal agency shall pay the full amount of the first $25,000 of the cost to a State agency of providing payments and assistance for a displaced person under sections 4626, 4630, 4635, and 4655 of this title, on account of any acquisition or displacement occurring prior to July 1, 1972, and in any case where such Federal financial assistance is by loan, the Federal agency shall loan such State agency the full amount of the first $25,000 of such cost.

Eminent domain payment as precluding relocation payment or assistance

(b) No payment or assistance under section 4630 or 4655 of this title shall be required or included as a program or project cost under this section, if the displaced person receives a payment required by the State law of eminent domain which is determined by such Federal agency head to have substantially the same purpose and effect as such payment under this section, and to be part of the cost of the program or project for which Federal financial assistance is available.

Amendment of prior grants or contracts to include cost of providing relocation payments and services

(c) Any grant to, or contract or agreement with, a State agency executed before January 2, 1971, under which Federal financial assistance is available to pay all or part of the cost of any program or project which will result in the displacement of any person on or after January 2, 1971, shall be amended to include the cost of providing payments and services under sections 4630 and 4655 of this title. If the head of a Federal agency determines that it is necessary for the expeditious completion of a program or project he may advance to the State agency the Federal share of the cost of any payments or assistance by such State agency pursuant to sections 4626, 4630, 4635, and 4655 of this title.
Pub.L. 91–646, Title II, § 211, Jan. 2, 1971, 84 Stat. 1900.