ANTILLES COUNCIL OF SCHOOL OFFICERS, LOCAL 68, AMERICAN FEDERATION OF SCHOOL ADMINISTRATORS, AFL–CIO; Dennis C. Smith; Andrew Bielecki; Gerard C. Hooley; Ann Wier; Don E. Corbin; Lane Gutsche, Plaintiffs,

v.

John F. LEHMAN, Secretary of the United States Department of the Navy; Terrel H. Bell, Secretary of the United States Department of Education; Charles F. Kenney, Superintendent of the Antilles Consolidated School System; Rear Admiral Arthur K. Knoizen, Commander of the United States Naval Forces in the Caribbean; Rear Admiral K.L. Shugart, Chief of Naval Education and Training of the United States Department of the Navy; William Stormer, Director of the Division of School Assistance in Federally Affected Areas of the United States Department of Education, Defendants.

No. Civ. 81–0564.

United States District Court, D. Puerto Rico.

Nov. 12, 1982.

Francisco A. Besosa, Bobonis & Besosa, Santurce, P.R., for plaintiffs.

Andrew M. Wolfe, Dept. of Justice-Civ. Div., Washington, D.C., and Raymond L. Acosta, U.S. Atty., Hato Rey, P.R., for defendants.

## MEMORANDUM OPINION AND ORDER

CEREZO, District Judge.

■ This action calls for the determination of whether a 1978 amendment to Section 6 of Public Law 81–874, 64 Stat. 1107, 20 U.S.C. Sec. 241 (Section 6) providing that incidents of employment of Section 6 school personnel be "on the same basis" as those granted to school personnel of the District of Columbia (D.C.) means that the former should, besides receiving the same benefits as the latter, also be entitled to obtain their employment benefits by using the same procedures of negotiation as the latter; *ergo,* through collective bargaining. Plaintiffs are the principals and assistant principals [1] of the schools which comprise the Antilles Consolidated School System (School System) and the union which they belong to, the Antilles Council of School Officers (Council).[2] These schools are all located in military bases or installations and within the scope of Section 6. The complaint seeks a declaratory judgment decreeing that the 1978 amendment to Section 6 grants the right to bargain collectively with the School System and enforcement of said judgment by means of a permanent injunction ordering defendants[3] to recognize the union as the exclusive representative of the School System's principals, designate the official who will represent the School System and commence collective bargaining with this union no later than 30 days after judgment is entered. Plaintiffs also seek judgment declaring that they actually do not enjoy the same terms, conditions and incidents of employment as their D.C. counterparts and pursue mandatory injunctive relief equalizing these conditions on a permanent basis. Defendants have filed a motion to dismiss[4] asserting that the 1978 amendment to Section 6 does not grant plaintiffs the right of collective bargaining and that their second request should also be dismissed since they have not specifically alleged which incidents of employment are not the same as those of their D.C. counterparts. They also point out that plaintiffs filed a petition for recognition as a collective representative to the Federal Labor Relations Authority (FLRA) which was denied and not appealed.

The 1978 amendment to Section 6 which was prepared by Puerto Rico's Resident Commissioner, Baltasar Corrada, incorporated the following language into the statute: "Personnel provided for under this subsection outside of the continental United States, Alaska and Hawaii, shall receive such compensation, tenure, leave, hours of work and other incidents of employment on the same basis as provided for similar positions in the public schools of the District of Columbia. . . . " At the time this amendment was approved, the D.C. school principals had obtained the right to bargain collectively with the D.C. education authorities

---

1. Dennis C. Smith, Andrew Bielecki, Gerard C. Hooley, Ann Weir, Don E. Corbin, Lane Gutsche.

2. Local 68 of the American Federation of School Administrators, AFL–CIO.

3. Defendants are: John F. Lehman, Secretary of the Navy; Terrel H. Bell, Secretary of Education; Dr. Charles F. Kenney, Superintendent of the Antilles Consolidated School System; Rear Admiral Arthur K. Knoizen, Commander of the U.S. Naval Forces in the Caribbean and Area Coordinator of the Antilles Consolidated School Systems; Rear Admiral K.L. Shugart, Chief of Naval Education and Training, Department of the Navy; William Stormer, Director of the Division of School Assistance in Federally Affected Areas, U.S. Department of Education. They are all sued in their official capacity.

4. Plaintiffs were permitted to amend their complaint in view of defendants' first motion to dismiss which showed the insufficiency of their original allegations as to the union's capacity to institute the action.

through an informal arrangement. This informal arrangement was given statutory authority by Congress on March 3, 1979. Although this Act was passed after the 1978 amendment, plaintiffs contend that Congress was aware of the informal collective bargaining agreement and when they passed the amendment, the phrase "on the same basis," clearly indicated that the principals of Section 6 schools in Puerto Rico were entitled to request their employment benefits using the same procedure as their D.C. counterparts. Plaintiffs' interpretation is not in harmony with the policy of the statute, as portrayed by its text and legislative history.

A reading of the entire section reveals that the two sentences right before the 1978 amendment refer to the standard of education to be provided at Section 6 schools. In the case of Section 6 schools which are outside of the continental United States, Alaska and Hawaii the educational standard to be met is that the education should be "comparable to free public education provided for children in the District of Columbia." The next sentence states that "for the purposes of providing such comparable education" the incidents of employment of Section 6 personnel "may be fixed without regard" to several federal employment and civil service acts.[5] The next sentence is the 1978 amendment plaintiffs contend confers upon them the right of collective bargaining. An examination of the legislative record of Section 6 reveals that this statute was part of a legislation which had as its main purpose the compensation of local school communities that provided free education to children of federal employees or military servicemen living in federal property. Congress recognized that the local school authorities might be overburdened by the impact of federal activities and thus, to remedy the situation, federal funds were appropriated for these local school systems. Section 6, however, dealt only with those military installations situated in places where no local educational agency could provide suitable education for the children of certain federal employees and military servicemen. Facilities to provide such suitable education were then built at these bases.[6] Also long recognized by Congress was the special situation of Puerto Rico and other territories where the requirement that the standard of education of Section 6 schools be that of comparable communities in the state was not appropriate. In the case of Puerto Rico specifically, the legislative history demonstrates that Congressmen believed that the education provided by the Puerto Rico public school system was inadequate, mainly because English was not the primary language of instruction and the tuition of private schools where classes were conducted in English was too expensive. In Senate Report No. 311 the following is said:

Puerto Rico is the only one of these places where the off-base schools are not suitable for the attendance of children whose families have come from the mainland inasmuch as the off-base schools are overcrowded and their primary language of instruction is Spanish. . . .

Although Section 1 of H.R. 5874 includes all of the territories encompassed in the 1954 amendment to Public Law 81–874, it would apply particularly to Puerto Rico. This is made even more specific in H.R. 5874 by the third condition for eligibility; i.e. that English is not the primary language of instruction in schools in the locality. . . . 1965 U.S.Code Cong. & Ad. News, at 1911.

The report indicates that these schools also accommodate certain federal employees

5. The Classification Act of 1949, as amended, the Annual Sick Leave Act of 1951, as amended, the Federal Employees Pay Act of 1945, as amended, the Veterans' Preference Act of 1944, as amended, and the Performance Rating Act of 1950, as amended.

6. See: S.Rep. No. 2458, 81st Cong., 2d Sess., *reprinted* in (1950) U.S.Code Cong. & Ad.News

4014; S.Rep. No. 714, 83rd Cong. 1st Sess., *reprinted* in (1953) U.S.Code Cong. & Ad.News 2325; S.Rep. No. 311, 89th Cong. 1st Sess. *reprinted* in (1965) U.S.Code Cong. & Ad.News 1910; H.R.Rep. No. 1137, 95th Cong., 2d Sess. 108, *reprinted* in (1978) U.S.Code Cong. & Ad. News 4971, hereinafter referred to year and page of U.S.Code Cong. & Ad.News.

who do not reside at a federal facility but who must use the school system because:

Educational opportunities for children of federal employees who come from the mainland are extremely limited in Puerto Rico. As was mentioned, the public schools of the Island are very much overcrowded and are taught in the Spanish language.

Most of the private schools are taught in Spanish, and the tuition for the few schools taught in English is extremely high. Admittance to private schools conducted in English is uncertain because of long waiting lists and inadequate facilities. Thus, about the only practical way for the children of federal employees residing off base to receive an education comparable to what they would receive on the mainland is through attendance in the schools constructed on base for children of military personnel stationed in Puerto Rico.... *Idem,* at 1911–1912

The legislative history of the 1978 amendments reveals a special concern with various problems that Section 6 schools, particularly the ones in Puerto Rico, were confronting. One of these was that the division of authority between the military and the U.S. Department of Education resulted in that neither of the agencies was assuming responsibility for the well-being of the schools. As a consequence, the physical conditions of the school buildings had deteriorated to such an extent as to create a dangerous situation for the school-children. The use of construction funds to remodel and rehabilitate the buildings was part of the 1978 amendments. There was also concern with the fact that decisions affecting Section 6 schools in Puerto Rico were made unilaterally by an admiral who was not an educator. Parents and teachers mentioned that this situation had led to unsound decisions affecting the quality of education. The teachers mentioned that the lack of specificity in Section 6 on personnel practices, specially regarding salaries, invited abuse. The House Report indicates:

Unilateral authority rests with the admiral.

According to parents of children attending Fort Buchanan, this situation has led to several unsound decisions to reduce program offerings and ancillary services, decisions which have adversely affected the quality of education and in which parents have had no input.

Representatives of the Antilles Consolidated Teachers Association also expressed displeasure with the present arrangement. They concurred with the parents' suggestion that a multi-member board of education would better suit the interests of the school system. They also pointed out that P.L. 874 invites abuse by not specifying personnel practices, especially regarding salary. Although the legislation suggests that the education in areas outside the mainland U.S. be comparable with education in the District of Columbia, teachers recommended language which would unequivocally align their salaries with those in the District....

1978 U.S.Code Cong. & Ad.News at 5078.

To that effect, the Report indicates that the Committee "adopted an amendment making clear that the compensation, tenure, leave, hours of work and other incidents of employment for personnel in school systems located outside the 50 States must be on the same basis as that provided in the public schools of the District of Columbia...." Section 6 was also amended to create an elective school board with authority to oversee the expenditure of funds and operation of the schools. The Commissioner of Education was required to ensure the most efficient expenditure of funds for these schools by conducting an annual accounting and by gathering data on the quality of instruction provided by these schools. The amendments also clarified the prerequisites of eligibility for admission for certain federal employees' children.

Neither the right of Section 6 personnel to bargain collectively with the Antilles School System nor language from which one can reasonably infer the existence of such right is found in the statute. Neither have we found in the legislative record examined any indication of this. Taken as a

whole, the record reveals that the primary purpose of the statute is that the *quality* of education given by non-state Section 6 schools be comparable to the education provided by D.C. schools. If the record is examined only as to the 1978 amendment, again there is no basis to infer that Congress intended to confer upon Section 6 personnel the right to bargain collectively or that this was a special problem which required remedial treatment. The record only shows that teachers and *parents* were concerned with the effect of the actual decision-making process on the *quality of education*. Nowhere does it appear from the record examined that Congress considered that these problems would be remedied by granting collective bargaining rights to teachers and principals or that this would indeed improve the quality of education. To the contrary, what the parents and teachers suggested to remedy decision-making problems was the creation of a multi-member board of education. This suggestion was granted by the amendments. The other concern which Congress addressed in the amendments had to do with clarifying and unequivocally aligning the salaries and other incidents of employment of Section 6 personnel with those of their D.C. counterparts. Congress considered that specific language would prevent abuse. There is no indication, however, that it intended that these employment benefits conferred upon Section 6 personnel should also be obtained by the same mechanisms of negotiation that their D.C. counterparts had used to obtain them. There is nothing in the statute to that effect, and nothing in the legislative record which would lead to such a conclusion. Silence serves as a weak foundation for plaintiffs' argument. See *Zuber v. Allen*, 396 U.S. 168, 185, 90 S.Ct. 314, 323, 24 L.Ed.2d 345 (1969).

Nevertheless, they refer to two letters written by Commissioner Corrada del Rio which supposedly denote the legislative intention of granting them the right of collective bargaining. We have examined these letters and find that they merely reveal his displeasure with the way the U.S. Department of Education was carrying out the 1978 amendments to Section 6. One of the letters, dated November 27, 1979, and directed to Dr. Mary Berry, Assistant Secretary of the Department of Health and Human Services, essentially addressed two problems: the stringent application of the eligibility requirements of admission to the schools for nonmilitary federal employee's children and the consultive, rather than working, role that the elective school board had taken. He then observed that if such problems continued he would request hearings on these matters. The Resident Commissioner accompanied copies of the legislative record. The contents of the letter reveals his perceptions of the purpose of the 1978 amendment and his insatisfaction upon perceiving that the same was not being achieved. Yet, nowhere in the letter is there reference to anything which bears a resemblance to that which plaintiffs contend the statute clearly confers upon them. The question that naturally comes to mind then is, why the Resident Commissioner did not mention anything about collective bargaining if this was such a clear remedial purpose of the 1978 amendment?

The other document that plaintiffs claim signals the real meaning of the 1978 amendment is a letter by Mr. Corrada del Rio dated January 24, 1980 in response to one sent by Mr. Peter S. O'Brien, Executive Vice-President of the American Federation of School Administrators, AFL–CIO (Federation). Mr. O'Brien had informed Mr. Corrada del Rio of the Federation's endorsement of his observations and concerns as voiced in the letter to Dr. Berry. He had also indicated that the Federation had granted an application to the Antilles Council of School Officers (Council) and that this Council "requested recognition and negotiations pursuant to the amended Section 6." Mr. O'Brien further stated that the Council was seeking "only those rights of collective representation afforded to the same employees in the public schools of the District of Columbia. . . ." He offered the testimony of the Council and the Federation at any future hearing to discuss Section 6. Mr. Corrada del Rio's brief reply was that:

As I stated in my letter to Dr. Mary Berry, I am gravely concerned with the interpretation which HEW has given to the legislation in P.L. 95–561. Your request for recognition and negotiations is an important step in the resolution of the problems encountered by the Antilles Council of School Officers.

The Resident Commissioner then indicated that no hearings were scheduled but that he would inform Mr. O'Brien should the opportunity arise. Mr. Corrada del Rio also wished to be informed as to the status of the Council's petition to Admiral Knoizen.

We fail to see any significant relationship between these comments regarding the problems encountered by the Antilles Council of School Officers and plaintiffs' interpretation of Section 6. At the most, they merely show that the Resident Commissioner personally believed that the Council's problems may best be solved by its recognition as a union and by negotiations with the admiral. From this statement we cannot jump to the conclusion that the Resident Commissioner believed that the only way to deal with the problems that Section 6 was designed to solve would be through collective bargaining nor that such a means was contemplated in the statute. Plaintiffs' conclusion requires that we perform some sort of judicial psychoanalysis of Mr. Corrada del Rio's undefined intentions in order to infer that he believed that *the Council's* problems were the same problems addressed by Section 6. The truth of the matter is that his answer is merely an uncompromising statement that does not address the matter of plaintiffs' collective bargaining rights directly nor in a manner that one could reasonably conclude that the author of this legislation manifested his understanding that Section 6 was designed to confer the right of collective bargaining to these school officers.

Even if we concede that this short statement is indicative of the Resident Commissioner's position on this subject, this is insufficient to conclude that the *legislative* intent was the same. Although some courts have considered important in analyzing a statute's meaning to examine comments made by the draftsmen and/or authors of the legislation, *American Waterways Operators Inc. v. United States,* 386 F.Supp. 799, 804 (D.D.C.) affd. *Water Transport Assoc. v. United States,* 421 U.S. 1006, 95 S.Ct. 2410, 44 L.Ed.2d 675 (1975); *Contra: Friedman v. United States,* 364 F.Supp. 484, 488 (S.D.Ga.1973), said comments must have been also made before the legislative body that enacted the legislation in order to determine whether the observations by the author or draftsman were incorporated into the final approved bill. See: *Zuber v. Allen,* 396 U.S. 168, 192–94, 90 S.Ct. 314, 327–328, 24 L.Ed.2d 345 (1969); *American Waterways Operators Inc.,* at 804; *Epstein v. Resor,* 296 F.Supp. 214, 216 (N.D.Cal.) affd. 421 F.2d 930 (9th Cir.), *cert. denied* 398 U.S. 965, 90 S.Ct. 2176, 26 L.Ed.2d 549 (1970). Post passage remarks by legislators, however explicit, cannot serve to change the legislative intent, as expressed in the record prior to an act's approval. *Blanchette v. Connecticut General Insurance Corps.,* (Regional Rail Reorganization Cases), 419 U.S. 102, 132, 95 S.Ct. 335, 352, 42 L.Ed.2d 320 (1974); *cf.: Parlane Sportswear Co. v. Weinberger,* 513 F.2d 835, 837, n. 2 (1st Cir.) *cert. denied* 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252 (1975) (Views of one Congress as to the meaning of statutes enacted by an earlier Congress are entitled to little, if any, weight). Pre-passage remarks by a single legislator, even if made by a sponsor or influential legislator before the legislative body responsible for the act, are not controlling in analyzing legislative history. *Consumer Product Safety Comm. v. GTE Sylvania, Inc.,* 447 U.S. 102, 100 S.Ct. 2051, 64 L.Ed.2d 766; *Chrysler Corp. v. Brown,* 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979); *General Electric Co. v. United States,* 610 F.2d 730, 734 (Ct.Cl. 1979). If these isolated comments are made after the legislation was enacted and in a private communication, they are of no use to ascertain legislative intent. *Rogers v. Frito-Lay Inc.,* 611 F.2d 1074, 1080 (5th Cir.) *cert. denied, Moon v. Roadway Express, Inc.,* 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980); *Goolsby v. Blumenthal,* 581 F.2d

455 *cert. denied* 444 U.S. 970, 100 S.Ct. 462, 62 L.Ed.2d 384 (1978); *Aparacor, Inc. v. United States,* 571 F.2d 552, 556 (Ct.Cl. 1978). If we assume that from Mr. Corrada del Rio's general comment in his private communication to Mr. O'Brien one can reasonably infer that the author of the 1978 amendment intended Section 6 principals to have rights of collective representation, this private comment alone, absent an indication that Congress considered it before enacting the legislation, remains the personal view of a single legislator and is not part of the legislative history. See *Idem,* and *Gunther v. County of Washington,* 623 F.2d 1303, 1318 (9th Cir.1979).

In the situation before us, an integrated reading of the 1978 amendment with the rest of the statute's language; see: *Philbrook v. Glodgett,* 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975); *Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962); *Payne v. Panama Canal Co.,* 607 F.2d 155, 164 (5th Cir.1979); *Wadsworth v. Whaland,* 562 F.2d 70, 78 (1st Cir.) *cert. denied* 435 U.S. 980, 98 S.Ct. 1630, 56 L.Ed.2d 72 (1978) demonstrates that the central purpose of the statute is to provide quality education at these special schools. Our examination of the legislative record also confirms the concern with education evinced in the statutory language. See: *Watt v. Alaska,* 451 U.S. 259, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981); *Hunt v. Nuclear Regulatory Commission,* 611 F.2d 332, 336 (10th Cir.) *cert. denied,* 445 U.S. 906, 100 S.Ct. 1084, 63 L.Ed.2d 322 (1980); *Ocean Drilling & Exploration Co. v. United States,* 600 F.2d 1343, 1347–1348 (Ct.Cl.1979). There is nothing either in the language of the statute or in the legislative record examined to support plaintiffs' posi-

tion. Furthermore, to derive rights of collective bargaining from the silence of the record would not only require an unwarranted exercise of judicial interference with the statute but may also lead to dangerous results that may affect the principal purpose of this legislation in guaranteeing quality education to the children of certain military servicemen and federal employees. The benefits that plaintiffs may obtain by negotiations are necessarily limited by the ones they should be now enjoying according to the clear mandate of the statute.[7] Aside from seeking enforcement of these employment benefits, one must inquire as to why plaintiffs need collective bargaining to obtain what is already provided for by the statute? What benefits of employment can they bargain for without affecting the policy of guaranteeing "comparable education?" It is possible that the Council may bargain themselves out of some employment benefits conferred upon their D.C. counterparts in exchange for some other incident of employment of a local nature that they may deem more important.[8] We have no way of determining when and to what degree this exchange will affect the standard of education required by the statute. To leave to the uncertainties inherent in the give and take process of collective bargaining the clear congressional mandate of providing education of a certain quality for Section 6 schools is unwarranted.

Problems of a practical nature may also arise should we grant a naked right to bargain collectively without any structural framework of procedure as is generally required to ensure that the delicate process of negotiation is carried on effectively. Plaintiffs state that, once the court grants them the right to bargain collectively, they will

---

**7.** Whether the employment benefits conferred by the statute are being enjoyed by plaintiffs is, of course, another matter which will be dealt with in the second part of this opinion.

**8.** Plaintiffs hint that the real aim of their collective negotiations may be to free themselves from the standard provided by the statute when they mention:

[I]t should be noted that a collective bargaining agreement negotiated by and between

plaintiffs and the Antilles School System would be easier to manage and would be in more tune with local conditions than the granting to plaintiffs of the same incidents of employment of their D.C. counterparts. The latter would entail a constant scramble to implement here in Puerto Rico any changes implemented in D.C.

Paragraph 8, plaintiffs' Motion filed February 11, 1982.

devise the procedures also by negotiation. This naive contention ignores the reality that negotiations are not always held on a cordial atmosphere and that often a disagreement on a minute detail holds up the process indefinitely. If plaintiffs pretend to bargain the procedures of negotiation in addition to their employment benefits there is a strong probability that they may have to file an action every time they come up with a hurdle in procedure. Plaintiffs might spend years litigating the negotiation procedures to follow and never get to discussing their employment benefits. In addition, since the hierarchy and the organizational structure of the District of Columbia is not akin to that provided by Congress to Section 6 schools, any changes in the D.C. laws regarding the procedural mechanisms of negotiation and the decision-making channels will force the parties to seek constant recourse to the courts requesting clarification of every small procedural change on which they disagree and for definitions as to the proper equivalents to the decision-making entities provided by the D.C. municipal government to deal with employment matters with the ones provided by Congress for Section 6 schools. The fact that these results may affect the essential purpose of the statute and create whimsical and impractical situations are additional reasons that militate against plaintiffs' interpretation of the 1978 amendment to Section 6. Acts of Congress should be read so as to avoid absurd results and to further the congressional policy embodied in them. See: *Citizens to Save Spencer Cty. v. U.S. Environs., etc.,* 600 F.2d 844, 870 (D.C.Cir.1979); *Sierra Club v. Train,* 557 F.2d 485, 488–90 (5th Cir.1977); *Sode v. United States,* 531 F.2d 531, 537–38 (Ct.Cl.1976).

We conclude, therefore, that Section 6 does not confer upon plaintiffs the right to bargain collectively with their employer.[9] Accordingly, this part of plaintiffs' complaint is DISMISSED.

■ The second part of plaintiffs' argument, however, falls squarely within the provisions of the statute. If their allegations of unequal employment benefits are proven to be true, then Section 6 clearly grants them the right to obtain equality with their D.C. counterparts. Defendants' argument as to plaintiffs' lack of standing because no specific injury in fact which can be remedied by specific relief of a conclusive character has been shown, see: *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 41–43, 96 S.Ct. 1917, 1925–1926, 48 L.Ed.2d 450 (1976), ignores the procedural stage at which we are dealing with this issue. Plaintiffs have alleged that they do not enjoy the same conditions of employment, specifically: grievance procedures, transfers, leaves and job performance evaluation (amended complaint, paragraph 27). The "injury in fact" that defendants contend is missing is precisely this lack of equal employment conditions which is mandated by Section 6. If the court determines that plaintiffs are not enjoying the same benefits as their D.C. counterparts in the manner required by the statute, *specific* relief ordering defendants to take the necessary steps to ensure equality will ensue. Modern requirements of pleading dictate that a complaint should not be dismissed for failure to state a claim "unless it

---

9. Plaintiffs' withdrawal of their appeal from the FLRA's decision denying them union status makes it unnecessary to elaborate whether, as federal employees, they may rely on another federal statute to support their alleged right to bargain collectively. Such appears to be the position suggested by defendants' interpretation of the Comptroller General's rulings to the effect that any federal personnel act not expressly excluded by Section 6 applies to these employees, see: 52 Comp.Gen. 291 (1972), 58 Comp.Gen. 430, 434 (1978); *Fort Rucker Elementary School Employees,* —— Comp.Gen. —— (1979) File B–192528, April 20, 1979, and by the administrative decision of *Department of the Army, Ft. Bragg Schools,* 3 FLRA No. 57, June 10, 1980 holding that Section 6 teachers were federal "employees" protected by the Federal Service Labor Management Relations Statute, 5 USC Sec. 7101, *et seq.* However, plaintiffs' voluntary decision to abandon the proper channeling of their administrative appeal concludes this matter. See: 5 USC Sec. 7123, *National Federation of Federal Employees Local 1263 v. Commandant, Defense Language Inst.,* 493 F.Supp. 675, 679 (N.D.Cal. 1980).

apears beyond doubt that the plaintiff can prove no set of facts in support of his claim" so as to grant the relief requested. *Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). Plaintiffs' allegations that they do not enjoy the same conditions of employment regarding grievance procedures, transfers, leaves and job performance evaluation adequately set forth a claim and give defendants a fair notice of its basis, *id.,* see also: *Ferranti v. Moran,* 618 F.2d 888, 890 (1st Cir.1980). Furthermore, if we were to consider the motion to dismiss as one for summary judgment under Rule 12(c) Fed.R.Civ.P., in view of the matters outside the pleadings that have been presented (i.e.: plaintiffs' application to the FLRA) and the many documents filed in support by both parties, movants have failed to dispel all doubts as to the existence of controversies on material facts as required by Rule 56 Fed.R.Civ.P. See: *Gual Morales v. Hernández Vega,* 579 F.2d 677, 681 (1st Cir.1978); particularly, in light of plaintiffs' Exhibit 6 which contains statements by one of the defendants admitting that some of plaintiffs' employment conditions are not the same as those of their D.C. counterparts. Defendants should have at least clarified, denied or somehow rebutted these statements to enable us to consider their lack of standing argument. Such unanswered allegations and statements serve only to demonstrate that defendants' argument at this stage of the proceedings is premature. Plaintiffs having made the necessary initial showing to support their right to eventually attempt to prove the second part of their claim, the motion to dismiss this aspect of their claim is hereby DENIED.

Accordingly, the first claim set forth in the amended complaint requesting the court to enter a declaratory judgment that Section 6(a) of Public Law 95–561, 20 U.S.C. Section 241(a) confers upon plaintiffs the right to bargain collectively their compensation, tenure, leave, hours of work and other incidents of their employment relationship with the Antilles Consolidated School System and further requesting mandatory injunctive relief to enforce such a decree is hereby DISMISSED. The motion to dismiss the alternative claim stated in the amended complaint by virtue of which plaintiffs seek an injunction mandating defendants to extend to the individual plaintiffs the same terms, conditions and other incidents of employment presently enjoyed by members of the Washington, D.C. Council of School Administrators is DENIED.

A status conference shall be set by the U.S. Magistrate to ensure a prompt disposition of plaintiffs' remaining claim.

SO ORDERED.